[No. 62429-1.    En Banc.    November 9, 1995.]

*In the Matter of the Dependency of* K.R., ET AL.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, ET AL., *Petitioners*, v. STEVEN JONES, ET AL., *Respondents*.

*Christine O. Gregoire, Attorney General,* and *Kirsten H. Prud'Homme* and *Jaqueline B. Rosenblatt, Assistants*; and *Bertha B. Fitzer,* for petitioners.

*Ronald D. Heslop* and *Ross E. Taylor,* for respondents.

MADSEN, J. — A Pierce County Superior Court judge terminated Patsy Jones' parental rights to her daughters, K.R. (born March 12, 1983) and R.J. (born March 7, 1988), Steven Jones' parental rights to R.J., and Ralph Rogers' and John Doe's parental rights to K.R. The court of ap-

peals reversed the termination order and remanded for a new trial. The State and the children's guardian ad litem (GAL) petitioned for review. We reverse.

## FACTS

Because an important issue in this case is whether sufficient evidence supports the trial court's termination order, a greater than usual review of the facts is warranted. On October 27, 1989, K.R. and R.J. were taken from Patsy Jones and placed into protective custody based on K.R.'s statement to a school counselor, a Child Protective Services (CPS) social worker, and a police officer, that Patsy looks at her bottom and spreads the lips of her vagina open every day "looking for 'poison' " and that Patsy did the same to her sister, R.J. The initial investigation was prompted by the statement of Patsy Jones' roommate, Dawn Emberley, to the school that she overheard a conversation between Patsy and K.R. in their bedroom in which K.R. said "No Mommy, I'm tired. Ouch Mommy that hurts. Don't hurt me Mommy . . . . No, I promise I won't Mommy." Clerk's Papers (CP) at 25; CP (vol. I) at 22. According to Emberley, this conversation took place in Jones' bedroom and lasted for almost two hours.

After removal, at the Joneses' request the children were first placed with Emberley who kept them until December 1989 when they were placed with foster parents. During this time, the Department of Social and Health Services (DSHS) made efforts to get both Patsy and Steven Jones treatment and to find a family placement for the children. Patsy continued to deny that any abuse had occurred and Steven failed to get treatment. Patsy also objected to placing the children with her family, Steven, or his family.

## I

### DEPENDENCY DISPOSITION

On April 12, 1990, the State filed dependency petitions for K.R. and R.J., based upon K.R.'s statement that Patsy checked her vaginal area for "poisons," CP at 22-25; CP

(vol. I) at 19-21; K.R.'s statement that Patsy had also checked R.J.'s vaginal area but stopped because R.J. cried; K.R.'s statement that Patsy told her not to tell anyone that she looked for poisons; K.R.'s statement that the check hurts sometimes; K.R.'s relation of the same story to a police officer and that the children had been taken into protective custody on October 27, 1989; the conversation in the bedroom between Patsy and K.R. which Emberley overheard; K.R.'s examination by Dr. Yolanda Duralde revealing physical evidence consistent with sexual abuse and penetration;[1] Michael Comte's, MSW, examination of Patsy and conclusion that there was substance to the allegations and that Patsy constituted a risk "to the safety and well-being of her children," CP at 25; CP (vol. I) at 22; Verbatim Report of Proceedings (VRP) (vol. II) at 327; Patsy's continuing denial of the allegations of sexual abuse and refusal to cooperate with treatment recommendations; allegations that reasonable efforts to prevent out-of-home placement were not viable "due to the emergent nature of the situation and risk to" each of the children, CP at 25; CP (vol. I) at 22; and an allegation regarding R.J. that Steven Jones had indicated a willingness to care for R.J. but had not taken the steps necessary for this to occur.[2]

On July 6, 1990, a dispositional hearing was held. Testifying were Dawn Emberley, Kathy McGatlin (the school counselor), Dr. Duralde, Michael Comte, K.R., Patsy Jones, and Dr. Phyllis Schmidt (a psychologist who evaluated Patsy and Steven Jones). K.R. testified that Patsy had checked her for poison and that she did not like it. She also stated that the checks continued after a rash in

---

[1]No physical evidence indicated that R.J. had been abused.

[2]Criminal charges were filed against Patsy; however, these charges were later dismissed on March 27, 1991, because "after the court of appeals lifted its stay of proceedings, speedy trial time elapsed before the case could be brought to trial." CP (vol. II) at 111.

her groin area had disappeared.[3] Further, she said that no one else had ever touched her in an objectionable manner.

The court signed dispositional orders on September 21, 1990. With respect to Patsy Jones, the superior court found the children dependent and ordered that they remain in foster care because "a manifest danger" existed that the children would suffer abuse or neglect if left in the home and no parent or guardian was able to care for them. CP at 46-49, 50-53. The court ordered a drug and alcohol evaluation with treatment as recommended, sex offender treatment with "an approved therapist," and an anger management program. CP at 48, 52. The court signed an agreed dispositional order on that same day as to Steven Jones, ordering that he receive both a psychological and substance abuse evaluation and "follow through with any [resulting] treatment recommendations." CP at 36-39.

In its order of dependency filed on this same day, the court found that all of the allegations were true and dependency was ordered pursuant to RCW 13.34.030(2)(b) and (c).[4] Steven stipulated to his order. Rogers and Doe had earlier defaulted. None of the parties appealed these orders.

## II

### DEPENDENCY REVIEW

Following the April and October reviews, the court noted the supervising agency's dissatisfaction with the Joneses' level of cooperation and progress. On April 6, 1992, dependency was continued by the reviewing court as well as continuing no-contact between either parent and

---

[3]The defense presented evidence that Patsy Jones had checked K.R.'s vaginal area in connection with a rash.

[4]RCW 13.34.030(2) has since been renumbered as (4) by Laws of 1994, ch. 288, § 1. RCW 13.34.030(2)(b) defines a dependent child as one who has been abused or neglected by a person legally responsible for that child's care. RCW 13.34.030(2)(c) defines a dependent child as one "[w]ho has no parent, guardian, or custodian capable of adequately caring for the child."

the children in accordance with a March 23, 1992, order.[5] The order also noted the State's intent to seek termination and the parents' intent to contest the termination.

## III

### TERMINATION OF PARENTAL RIGHTS

On September 25, 1991, the State petitioned to terminate parental rights. The parental rights of Rogers and Doe were terminated by default and trial on the remaining petitions was held in June 1992.

### A. Sexual Abuse Evidence

At trial, Patsy Jones denied having any sexually inappropriate contact with either K.R. or R.J. K.R. testified that the only individual to touch her in her private parts was Dawn Emberley's daughter, Monica, and that this touching occurred before K.R. and her family moved in with the Emberleys. She testified that she did not remember telling anyone that her mother had touched her private parts. K.R. did remember telling Crystal Lee, a neighbor child, about Monica's actions. Lee's affidavit corroborated this. Lee also said that K.R. had stated that Patsy had checked for poison but never said that Patsy touched her private parts. The court also heard testimony from Dawn Emberley similar to that presented at the dependency hearing regarding the conversation she heard between K.R. and Patsy Jones.

A host of other witnesses testified as to what K.R. had told them about Patsy touching her. VRP (vol. I) at 143-46 (Linda Scott, social worker at DSHS, testifying that K.R. said this happened frequently and showed entry on anatomically correct dolls); VRP (vol. I) at 145 (Barbara

---

[5]This order was based on the recent abduction of the children by Patsy and Steven. On or about March 9, 1992, Patsy and Steven had taken the children from the foster home in which they were staying. They headed toward Mexico, stopping at Disneyland and Sea World on the way. Both Patsy and Steven were charged with two counts of custodial interference in the second degree to which they both pleaded guilty on May 18, 1992.

Salinas, police officer taking children into custody, testifying K.R. said this happened everyday while she was asleep); VRP (vol. I) at 248 (Kathy McGatlin, school counselor, saying K.R. told her it happens "every day after school, sometimes at night"); VRP (vol. III) at 577 (Patricia Bryant, school counselor, relaying K.R.'s statement that Patsy had touched her vaginal area in a bad way but only to check for poisons).

Bryant also discussed one instance where K.R. came to visit her and was "very, very angry," saying she was the "stupidest girl in the world" and that she had made up her mind not to tell the truth anymore. VRP (vol. III) at 582. K.R. also said that if anyone had told her "that by telling the truth, she never would get to see her mother again, she never would have told the truth to begin with." VRP (vol. III) at 582. Bryant also said that when K.R. came to visit after Patsy and Steven took her and R.J. to Disneyland, she recited that Patsy never touched her in a bad way, and that it had been Dawn and Dawn had threatened to kill her if she did not lie about it. When Bryant asked her which was the truth, K.R. said that Patsy touched her, but that she wanted to be with her mom and would not allow Patsy to touch her that way again.

K.R.'s therapist stated that K.R. had made approximately six disclosures to him regarding the abuse but had also recanted the allegations regarding her mother three times, twice saying that Dawn told her to say those things. He went on to testify that recants are very common in child sexual abuse cases and are an effort of the child to make amends for that child's disloyalty to the family. In K.R.'s situation this was done so she would not lose her mom.

The foster mother testified that K.R. and R.J. have sexually acted out several times and have a lot of bad dreams. She said that K.R. alternated between saying that Patsy had touched her and saying that Patsy had not. When K.R. said that Patsy did, she would look the foster mother

in the eye, but when K.R. denied the touching, she would fidget and avert her eyes.

A number of individuals testified for the defense. Dr. Currah, who treated Patsy Jones for nine months, testified that she did not think Jones had abused K.R. and did not think she would be a risk to K.R. According to Dr. Currah, Jones was very open and progressed well in treatment. Jones told Dr. Currah that she had only touched her children to put medicine on them when they had rashes. Dr. Currah did not think Patsy was in such denial that it would be unethical to treat her.

Dr. Clifford evaluated Patsy Jones and his report detailed Patsy's extensive history of being sexually abused as a child. According to the report, Patsy was not only sexually abused as a child by her stepfather, who threatened that he would do the same thing to her sister if she did not comply, but she was also sexually abused by her stepfather's friends, the babysitter, her brother, and strangers. Dr. Clifford declined to offer an opinion as to whether Patsy abused her children, but stated he did not believe Patsy to be in denial or see her as a risk to her children.

Clifford's polygrapher administered three tests and testified that when Patsy was asked in the last two tests if she ever spread open or penetrated K.R.'s vagina for pleasure, she showed no sign of deception. However, he did note that Patsy's responses in the second test to the questions whether she ever spread open K.R.'s vagina for anything other than hygienic reasons and whether she told K.R. she was checking for poison were inconclusive. She passed the last test with an overall score of plus one.

Steven Jones' mother testified that she took Patsy and K.R. to the hospital on April 4, 1989, because K.R. had a rash on the groin, privates, and a little on the stomach. She said the doctors diagnosed K.R. with scarlet fever and prescribed a lotion or salve which Patsy was to apply. The doctors also told Patsy to keep K.R. clean in that area and

suggested she check for a type of vaginal infection common in small girls with scarlet fever.

## B. Prospects for Return

Ray Marriot, the DSHS permanency planner, testified that returning the children would be risky. Duralde, Comte, and Comte's polygrapher also testified regarding their conclusions.

Several individuals testified regarding the Joneses' parenting and progress in court-ordered services. K.R.'s therapist stated that the bonds between Patsy and K.R. were not healthy because K.R. was in a caretaking role with Patsy. With regard to Steven, he did not see the same problems. Bruce Witham, another permanency planner, testified that Patsy had cooperated with the ordered drug and alcohol program and received a favorable discharge. Witham said she had delayed becoming involved in the ordered anger management classes, which she finally started in March 1991, and that she was not willing to attend sexual offender treatment until May 1991.

Witham testified that Steven Jones had not participated in treatment and had only been sporadically cooperative with the ordered drug and alcohol treatments. He had two unsuccessful discharges from the family treatment alternative to street crime (TASC) program and had only submitted twelve out of the twenty-five required urinalyses of which three tested positive for marijuana. Venita Able, of family TASC, testified that Steven only participated minimally in the treatment and was discharged because he stopped coming.

Witham stated that Steven had maintained only "60 to 65 percent of his visits" with the girls. VRP (vol. III) at 638. He was also concerned because Steven was still emotionally involved with Patsy. However, Witham thought Steven acted very appropriately when visiting the girls. He cited permanency for the girls, the need for stability, and the fact that the girls had bonded with their foster mother as important factors showing the need for

termination. Further, he believed that Steven's efforts toward reunification with his children had declined and that Patsy was not in appropriate sexual offender therapy since she was in denial.

The GAL testified that she met the parents for the first time at the end of one of the joint visits. She noticed Patsy take K.R. into a corner to talk and spoke to K.R. immediately after Patsy and Steven left. K.R. said "I don't want to talk about it again" and then immediately said "it is not true but Dawn Emberley told me to say my mom checked me for poison" and then later jumped in to say "but it didn't hurt." VRP (vol. III) at 751. Later, K.R. stated that Patsy had checked her for poisons at night when she was sleeping and told her in the morning. The GAL was dissatisfied with Steven's progress. She said that while Patsy had completed most of the court-ordered treatment, she had not completed sexual offender treatment which was necessary to insure the safety of the children. She also expressed her concern that the children needed permanency and thought that termination was in the best interests of the children.

Patsy's anger management counselor testified that Patsy progressed "really well" in her class and completed the course. VRP (vol. IV) at 807-08. She testified that Patsy has also attended a survivors of sexual abuse group in which her progress was "very favorable" but with "some glitches." VRP (vol. IV) at 811-12. When she asked Patsy directly if she did do it, Patsy said she would not admit to something she did not do and "would fight it as long as she had to." VRP (vol. IV) at 814. The counselor believed Patsy to be telling the truth.

### C. The Trial Court's Rulings

After final arguments, the trial judge orally granted termination and commented that he believed K.R.'s recantations resulted from counseling, therapy, and a trip to Disneyland while abducted by her parents. He also expressed the belief that "there is not and cannot be suc-

cessful therapy where there is denial." VRP (vol. IV) at 954. He said Patsy's and Steven's statements that they only assisted the other in the abduction of the children were "indicative" of their attitude toward responsibility. VRP (vol. IV) at 955.

On September 30, 1992, the court signed written findings of fact and conclusions of law for both K.R. and R.J. and issued an order terminating the Joneses' parental rights. The judge concluded that dependency had been found, that a dispositional order had been issued, and that appeal was not taken. He also found on the basis of res judicata that K.R. was abused by Patsy. The judge found that K.R. and R.J. were removed from custody and had been in foster care until the trial date, with the exception of the time they were abducted. He noted that while all services reasonably available which were capable of correcting the parental deficiencies had been offered or provided, the parents were "extremely slow and selective in participating." CP (vol. III) at 207-10, 216-18. Further, he found that Patsy Jones had failed to successfully participate in or complete sex offender treatment. He found that Steven Jones had failed to complete drug-alcohol treatment, to consistently attend scheduled visits, and to provide results of his psychological evaluation. He also found that "[t]here is little likelihood that conditions will be remedied so that the [children] can be returned to [their] mother in the near future" and that the parents were currently unfit to parent. CP (vol. III) at 210, 219.

In R.J.'s case, the court noted that Steven "has continually failed to protect [R.J.] from the possibility of abuse by Patsy Jones." CP (vol. III) at 218. The court found that continuation of the relationship diminished any prospects for integration into a stable and permanent home, was in the best interests of the children, and that the GAL recommended termination. Finally, he found that the allegations, findings of fact, and conclusions of law supporting

termination had been established by "clear, cogent, and convincing evidence." CP (vol. III) at 212, 221.

## D. The Court of Appeals' Reversal

The court of appeals reversed the termination, stating that findings of fact cannot be " 'based on res judicata.' " *In re K.R.*, 75 Wn. App. 781, 792, 880 P.2d 88 (1994). Further, it said the trial court is required to make new findings because the burden of persuasion for dependency is lower than the burden of persuasion for termination, and because RCW 13.34.180 requires a finding of present parental unfitness. *In re K.R.*, 75 Wn. App. at 793. The court remanded for a new trial.

### ANALYSIS

The State contends that the court of appeals' reversal was in error because the termination statute, RCW 13.04, does not require the State to relitigate dependency. While the State concedes that the trial judge erred in finding that the doctrine of res judicata governed the question of whether Patsy Jones sexually abused K.R. in 1989, it contends that the court's finding on the issue was a supplemental, nonrequired finding. The State contends that substantial evidence supports the trial judge's central finding—that the statutory requirements for termination were proven by clear, cogent, and convincing evidence.

The Joneses' counter that the trial court failed to make the necessary findings to support termination and instead found them to be unfit based on sexual abuse which the court ruled had been established by res judicata. They also contend that the remaining findings are not supported by substantial evidence. Finally, the parties disagree about whether the trial court erred in admitting polygraph testimony without a written stipulation.

## I

### THE TERMINATION

#### A. Whether Dependency Must Be Relitigated

At the time of the termination, RCW 13.34.190 in

relevant part stated that an order terminating all parental rights may be entered when the trial court finds that the petition's allegations pursuant to RCW 13.34.180(1)-(6) "are established by clear, cogent, and convincing evidence" and the order "is in the best interests of the child." Under RCW 13.34.180, the State must prove the following allegations:

(1) That the child has been found to be a dependent child under RCW 13.34.030(2); and

(2) That the court has entered a dispositional order pursuant to RCW 13.34.130; and

(3) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency under RCW 13.34.030(2); and

(4) That the services ordered under RCW 13.34.130 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided; and

(5) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and

(6) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home . . ..[6]

Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be " 'highly probable.' " *In re Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (quoting *Supove v. Densmoor*, 225 Or. 365, 358 P.2d 510 (1961)).

■■ The statute does not require relitigation of the dependency determination. Further, no explicit finding of

---

[6]The Legislature has since amended this provision, but, we do not consider these changes as they were not in effect at the time of the termination here. *See* Laws of 1993, ch. 412, § 2, at 1639 (effective July 25, 1993).

current parental unfitness is required. However, if the State proves the allegations set out above, an implicit finding of current parental unfitness has been made. *Krause v. Catholic Community Servs.*, 47 Wn. App. 734, 742, 737 P.2d 280, *review denied*, 108 Wn.2d 1035 (1987). Because the termination statute requires proof by clear, cogent, and convincing evidence, which necessarily and implicitly includes evidence of current parental unfitness, it comports with the constitutional due process requirement that unfitness be established by clear, cogent, and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). While there is no direct challenge to the constitutionality of the termination statute here, we observe that statutes are presumed to be constitutional. *Sator v. Department of Revenue*, 89 Wn.2d 338, 346, 572 P.2d 1094 (1977); *In re Harbert*, 85 Wn.2d 719, 722, 538 P.2d 1212 (1975). This presumption is borne out by RCW 13.34.180(5) in particular. As noted, it provides that there must be proof by clear, cogent, and convincing evidence that there is little likelihood that conditions will be remedied so that the child can be returned to the parent.

Thus, contrary to the Joneses' assertions, RCW 13.34.180 does not require the State to reprove the facts supporting the dependency by clear, cogent, and convincing evidence. Allegations (1) and (2) only require the State to prove by clear, cogent, and convincing evidence that the children have been found to be dependent under RCW 13.34.030 and that dispositional orders have been issued.[7] *Krause*, 47 Wn. App. at 741-45. It is indisputable that K.R. and R.J. were found to be dependent and that dispositional orders were issued.

---

[7]The State correctly points out that the time to contest the dependency and the facts supporting the dependency was on appeal of the dependency. *See In re Chubb*, 112 Wn.2d 719, 725, 773 P.2d 851 (1989) (noting that an appeal of right exists under RAP 2.2(a) for "the disposition decision following the finding of dependency or to a marked change in the status quo"). The Joneses did not do so.

## B. Findings and Substantial Evidence

Despite the Joneses' arguments to the contrary, the trial court's written decision does include findings on each of the necessary elements required by RCW 13.04. Finding 4 says that the children were found dependent and a dispositional order was issued. Finding 7 states that with the exception of the abduction period, the children have been removed from the custody of their parents since October 27, 1989. Finding 8 says that all services ordered pursuant to the dependency orders have been offered or provided to the parents. Findings 9 and 14 acknowledge that all services reasonably available which could correct the parental deficiencies have been offered or provided. Findings 9, 10, 11, and 15 recognize that there is little likelihood that conditions would be remedied so that the children can return and that the parents are "currently unfit" to parent the children. CP at 20, 29. Finding 18 states that the children's prospects for integration into a stable and permanent home would be diminished by continuing the parent-child relationships. Finally, findings 19 and 20 represent that an order of termination is in the best interests of the children.

Findings of fact which closely follow and which may to a certain extent parrot the requirements of RCW 13.34.180 are not rendered invalid if they are sufficiently specific to permit meaningful review. *In re C.B.*, 61 Wn. App. 280, 287, 810 P.2d 518 (1991); *see also In re LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986) (noting that while the degree of particularity required may vary depending on the circumstances of the case, findings "should at least be sufficient to indicate the factual bases for the [court's] ultimate conclusions"). Here, the trial court's findings are sufficiently specific for review. In addition to the findings set out above, the trial judge listed the services the Joneses were ordered to complete and found that the parents

had been extremely slow and selective in participating in these services as well as detailing the actual failures of the parents in this regard.

■ Because deference to the trial court is "particularly important in deprivation proceedings," its findings will not be disturbed unless clear, cogent, and convincing evidence does not exist in the record. *In re Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983); *see also In re Ramquist*, 52 Wn. App. 854, 860, 765 P.2d 30 (1988), *review denied*, 112 Wn.2d 1006 (1989). The findings for allegations (1)-(4) are supported by the record under this standard. As pointed out above, dependency was found in 1990. A dispositional order was issued under RCW 13.34.030. Having been removed since the fall of 1989, K.R. and R.J. were removed from the custody of their parents for at least six months. It is also clear that all the ordered services, required or necessary, have been offered or provided.

The focus of allegation (5) is whether parental deficiencies have been corrected. Included in any opinion regarding completion of treatment under RCW 13.34.180(5) is a judgment about the need for treatment. Here substantial evidence was presented that Patsy and Steven have been extremely slow and selective in availing themselves of the court-ordered services and that they have failed to complete the services ordered. Steven had not completed the ordered drug services and had not shown any recent inclination to continue. Patsy did complete her drug and alcohol treatment and anger management program, however, she did not complete her sexual offender treatment. Several individuals testified that because Patsy did not admit to sexually abusing her daughter, she can never successfully be treated and as a result her deficiencies as a parent will never be corrected. Implicit in the trial court's finding that Patsy Jones failed to participate in or complete sex-offender treatment because she denied abusing K.R. is the court's belief that such treatment was appropriate and necessary.

The Joneses argue, however, that the judge based his

conclusions regarding treatment on his res judicata ruling that Patsy Jones had abused K.R. We agree that the trial court's findings must not be based on some notion of res judicata. We are concerned with the use of the res judicata doctrine in termination proceedings as it may cast doubt on whether the judge made the required statutory findings based on clear, cogent, and convincing evidence. Fortunately, it is clear from the judge's oral ruling in this case that he did not mean that his findings of fact regarding allegation (5) were based on res judicata. Rather, his comments indicate that he was concerned primarily with K.R.'s recantation at the termination hearing. He noted that the passage of time as well as intervening events, including the abduction, had influenced K.R.'s testimony at the termination proceeding. His comments demonstrated his justifiable concern about relitigating the underlying dependency allegations some four years and six hearings later.[8] And, as discussed above, RCW 13.34.180 does not require it. Moreover, despite his reference to res judicata, the judge took eight days of testimony, including extensive evidence concerning the need for treatment and the likelihood that the conditions which led to dependency would be remedied so that the children could be returned in the near future. This evidence, discussed extensively above, was sufficient to support the judge's determination that allegation (5) was proven by clear, cogent, and convincing evidence. Finally, absent the completion of the proffered services, allegation (6) is satisfied because prospects for integration into the family home are dim. Testimony was presented that Steven cannot provide a stable separate home, having changed addresses and jobs quite often. More importantly, Steven is in contact with Patsy frequently, yet Patsy has not received appropriate

---

[8]The judge also said in conclusion 12 that

It is extremely traumatic for a child to testify in open court against a parent once. To require repetition of the same testimony months or years after the original incident and after there are serious charges and countercharges of witness tampering doubles the trauma and serves no useful purpose.

CP (Findings of Fact and Conclusions of Law) at 28.

sex-offender treatment and still poses a risk to the children. Further, she and Steven also abducted the children while there was an active dependency, casting further doubt on their ability to shoulder parental responsibility and to follow legal orders of the court. The abduction also shows that continuation of the parent-child relationship makes integration into a permanent home difficult.

Further, no family member is suitable for placement. Patsy indicated she did not want the children to go with her family because of the sexual abuse she suffered as a child and because her mother is an alcoholic. Nor did she want placement with Steven because she did not feel he could take care of the children, or with his family because Steve had been physically abused by his father. As for the children, R.J. has bonded with her foster mother. K.R. is very troubled, confused, and torn by her loyalties to Patsy. She also seems very confused and unsure of whether to tell the truth.

■ Thus, despite the conflicting evidence regarding abuse, substantial evidence exists under the clear, cogent, and convincing evidence standard to show that a termination order is in the best interests of K.R. and R.J. As this court has said "when the rights of parents and the welfare of their children are in conflict, the welfare of the minor children must prevail." *In re Sego*, 82 Wn.2d at 738. The trial court's determination regarding this issue is to be given " '*very* strong reliance.' " *In re Pawling*, 101 Wn.2d 392, 401, 679 P.2d 916 (1984) (quoting *Todd v. Superior Court*, 68 Wn.2d 587, 591, 414 P.2d 605 (1966)).

After reviewing the entire record and examining the requirements of RCW 13.34.180 and RCW 13.34.190, we conclude that the proper findings were made and substantial evidence supports the trial court's findings and conclusions as to allegations (1)-(6).

## II

### POLYGRAPH TESTIMONY

Lastly, the Joneses contend that the trial court should

not have admitted polygraph testimony absent a written stipulation signed by the prosecuting attorney, defendant, and defense counsel as required by *State v. Renfro*, 96 Wn.2d 902, 639 P.2d 737, *cert. denied*, 459 U.S. 842 (1982). In *Renfro*, this court noted that polygraph examinations have not gained scientific acceptability and for this reason adopted a test for when it would enforce a stipulation to admit polygraph evidence. *Renfro*, 96 Wn.2d at 906. This question has not been decided in the civil context.

We need not address this issue here, however. At trial, defense counsel made a motion to allow the testimony of polygraph experts for both sides, which the trial court granted. Later, defense counsel did make a motion in limine and object to the testimony of the State's polygraph examiner for lack of a written stipulation. However, defense counsel did so because the defense's examiner was going to be unable to testify. The State objected, arguing that a "stipulation" had already been made. VRP (vol. II) at 390-91. The trial court denied defense's motion, stating that other ways existed for taking the defense examiner's testimony. At defense counsel's suggestion, the trial court agreed to accept telephone testimony. When the State's examiner testified, defense counsel objected and the court noted a continuing exception. The defense's expert later testified via telephone. No objection was made.

Under the doctrine of invited error, counsel cannot set up an error at trial and then complain of it on appeal. *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds in State v. Olson*, 126 Wn.2d 315, 893 P.2d 629 (1995). This court will deem an error waived if the party asserting such error materially contributed thereto. *Id.* at 511. Here, defense counsel moved for the admission of polygraph testimony for both sides and should not be allowed to cry error after the trial court granted his motion, particularly since defense counsel's expert did testify without objection.

Based on our rulings above, we reverse the court of appeals.

DOLLIVER, SMITH, GUY, TALMADGE, and PEKELIS, JJ., concur.

JOHNSON, J. (dissenting) — The due process clause of the United States Constitution requires that in a proceeding to permanently terminate parental rights the State must prove a child's parent unfit by "clear, cogent, and convincing evidence" in order to terminate that parent's rights to the child. The United States Supreme Court has been very clear. Using the three-part balancing test originally set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct 893, 47 L. Ed. 2d 18 (1976), it concluded:

> In parental rights termination proceedings, the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing governmental interest favoring that standard is comparatively slight. . . . [U]se of a "fair preponderance of the evidence" standard in such proceedings is inconsistent with due process.

*Santosky v. Kramer*, 455 U.S. 745, 758, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

The majority today denies Washington parents this safeguard of a heightened burden of proof by misinterpreting the relevant statute and case law and turning a blind eye to the constitution. To reach this result, the majority defines unfitness as failure to remedy conditions, and then requires clear and convincing proof only of "failure to remedy" and no additional proof whatsoever of "conditions." I dissent because I believe adherence to the constitution requires more than clever word play.

The statute at question here, RCW 13.34.180, lists six factors which must be established by clear, cogent, and convincing evidence in order to terminate parental rights. None explicitly use the words "parental unfitness," but unfitness is normally proved under RCW 13.34.180(5). *Krause v. Catholic Community Servs.*, 47 Wn. App. 734, 742, 737 P.2d 280, *review denied*, 108 Wn.2d 1035 (1987);

*see also In re Hall,* 99 Wn.2d 842, 848, 664 P.2d 1245 (1983).
RCW 13.34.180(5) provides: "That there is little likelihood
that conditions will be remedied so that the child can be
returned to the parent in the near future . . . ." The ma-
jority reads this language to require only proof of the
parent's failure to remedy without proof of the underlying
condition being remedied. The majority would allow that
condition to be proved by the fact of the earlier depen-
dency. Because that condition was proved by the lower
preponderance standard at the dependency stage, however,
the majority's approach allows the State to substitute less
reliable evidence for the constitutionally required "clear,
cogent, and convincing" evidence.

The majority's reading of RCW 13.34.180(5) ignores prior
case law interpreting the statute. In *Krause,* the court held
that RCW 13.34.180(5) required proof that *"parental defi-
ciencies still exist* which are not likely to be remedied . . . ."
Krause, 47 Wn. App. at 742 (emphasis added). In *Hall,*
we found the statute required proof *"the parents had fallen
below minimal standards* and would be unable to correct
their deficiencies in the near future." *Hall,* 99 Wn.2d at
848 (emphasis added). In both cases, the State was required
to show at the termination proceeding not only that the
parents had not taken corrective action but also what
behaviors they had been expected to correct. The majority
would allow the State to substitute the earlier dependency
order for a showing of deficient behavior by the higher ev-
identiary standard.

The facts of this case illustrate the injustice of the
majority's approach. The majority says the State only
needed to establish by clear, cogent, and convincing evi-
dence that the girls' mother, Patsy, failed to take all the
remedial steps required of her in the dependency order.
The State need not prove by clear, cogent, and convincing
evidence that Patsy had sexually abused K.R. However,
without the latter finding, there was no basis for corrective
action. Moreover, Patsy's continued denial of the sexual
abuse charge was used against her as part of the proof of

her failure to remedy. Again, without a finding of sexual abuse, there was no basis for the court to conclude Patsy's denial was the result of sexual deviancy rather than innocence.

The behavior upon which Steven's parental rights were terminated was a failure to protect the children because he did not believe his wife had abused K.R. Without a finding of sexual abuse, there was no basis for the court to conclude the children should have been protected. Thus, adjudicating the underlying sexual abuse accusation is critical to determining whether both of the parents are currently unfit.

The original finding of sexual abuse by Patsy in the dependency proceeding was based on a preponderance of the evidence. At the time of the termination proceedings nearly two years later, K.R.'s testimony had changed. Patsy's treating therapist testified she did not believe Patsy had abused K.R. Had the State been required to prove the underlying sexual abuse by clear, cogent, and convincing evidence it is doubtful whether it could do so. Rather than dictating a legal approach making the State's job easier, these facts dictate that the parental rights of Patsy and Steven not be terminated.

As the Supreme Court held in *Santosky:*

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact-finding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' ". . . [I]n any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants.

*Santosky*, 455 U.S. at 754-55 (quoting in part *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979) (quoting *In re Winship*, 397 U.S. 358, 370, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring))). In

allocating this risk in the particular context of termination of parental rights, the Court said:

> The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state. . . . Thus, at a parental rights termination proceeding, a near-equal allocation of risk between the parents and the State is constitutionally intolerable.

*Santosky*, 455 U.S. at 768 (citation omitted) (quoting *Addington*, 441 U.S. at 427).

The majority here has allocated Patsy and Steven Jones a near equal share of the risk of being wrong about the underlying sexual abuse by a strained reading of our termination statute. The majority has ignored our precedent and, more importantly, our constitution, both of which require far more care be taken when depriving parents of their children.

DURHAM, C.J., and ALEXANDER, J., concur with JOHNSON, J.

Reconsideration denied January 19, 1996.