IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>L.C.C.-H. | No. 86140-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — R.H. challenges the trial court's entry of the order terminating his parental rights to his daughter and contends that the trial court erred when it determined that there was little likelihood that his parental deficiency could be remedied in the near future and he was currently unfit to parent. As to the latter claim, he asserts there was no nexus established between his identified parental deficiency and his ability to safely parent. We disagree and affirm.

FACTS

L.C.C.-H. was born July 28, 2019 to mother M.C. and father R.H. At the time of her birth, L was diagnosed with neonatal abstinence syndrome, and M.C. admitted to using methamphetamine and heroin during pregnancy. L was released from the hospital to M.C.'s sister pursuant to a one-month voluntary placement agreement. The Department of Children, Youth, and Families (DCYF) filed a dependency petition on August 30, 2019.

The court held a shelter care hearing on September 9. M.C. entered an agreed order for shelter care. R.H. contested the need for shelter care, and the

trial court agreed to place L with him subject to several conditions, including three months of twice monthly random urinalysis (UA). The court ordered that if any of the UAs were positive for illegal drugs or nonprescription controlled substances, L would not be immediately removed from her father, but R.H. would be required to complete a substance use disorder (SUD) evaluation. M.C. was allowed a minimum of three two-hour supervised visits each week. R.H. was not permitted to supervise M.C.'s visits, nor was the she permitted to live with him.

On November 4, the Des Moines Police Department placed L in protective custody after discovering R.H. and L in a home, not their residence, "that was deemed to be unsafe and where drug paraphernalia was found by the police." According to officers on the scene, R.H. hid with L when law enforcement arrived. M.C. was found in the same home, although R.H. denied that he knew she was there and asserted that L did not have contact with her mother that day. R.H. stated he was there because the resident of the home was assisting him with car repairs. L was temporarily placed with her maternal grandparents before being returned to R.H.'s care on November 7.

After this incident, DCYF filed a motion for emergency removal of L from her father's care. In its order on the motion, the court found there was "a valid safety risk that certifies this motion as an emergency" but denied it nonetheless. The court allowed L to remain with her father with additional conditions of placement and requirements to complete services. Among the new obligations, the court ordered R.H. to provide one random UA each week and comply with the conditions set out in the shelter care order. R.H. had negative UAs on November

7, December 5, December 20, and January 6, 2020. He also missed some scheduled UAs during those same months.

On January 10, 2020, the trial court denied DCYF's renewed motion to remove L from her father's care. The court ordered that R.H. complete a SUD assessment by the end of January and engage in the recommended treatment plan within 30 days. The court also ordered a hair follicle test for any "illegal substances" but specified that a positive test "will not on its own warrant removal." R.H. completed a hair follicle test which was positive for amphetamine, methamphetamine, morphine, codeine, and heroin. He failed to complete a SUD assessment as ordered.

The court appointed special advocate (CASA) filed an emergency motion for L's removal on January 27 due to concerns about her safety and R.H.'s lack of compliance with the court ordered conditions. According to the testimony of the DCYF social worker, they had not been able to contact R.H. consistently in order to schedule a health and safety visit. The CASA was apprehensive about L's living situation with R.H., as her whereabouts were unknown, and R.H.'s continued substance use. The trial court continued the hearing on the motion, maintained placement with R.H., ordered that he report his whereabouts for the time he was not at his approved residence and complete two UAs that week. The court also ordered that L undergo drug testing. L's test results were negative for illegal substances. On January 28, R.H. submitted a UA that was positive for methamphetamine and opiates.

On February 2, the court removed L from her father's care and placed her with a paternal aunt. The court entered an agreed order of dependency as to R.H. on February 28.[1] The order of dependency noted that he agreed in order to "provide court structure over the family" and to access services. At that time, the court also entered a dispositional order which required R.H. to complete random UAs once per week for 90 days and undergo a SUD assessment and follow all treatment recommendations. He was also ordered to engage in the "Promoting First Relationships" class which he had already started.[2]

At some point, after L's removal from his care, R.H. lost his housing.[3] DCYF regularly attempted contact and sent service letters and e-mails to both parents. Despite DCYF efforts to meet in person, the parents "rarely responded to meeting requests" and most meetings occurred "when offering direct assistance, such as gas gift cards or vouchers."

DCYF offered and referred SUD services to both parents, including assessments and UAs. R.H. completed a SUD evaluation on September 30, 2020, which resulted in a diagnosis of moderate opioid use disorder and "Other Stimulant Use Disorder." The assessment recommended that he complete level 2.1 intensive outpatient treatment. R.H. began attending level 1 SUD treatment at a different facility in September 2021. A progress report from the facility prepared in early October 2021 noted that of the ten sessions scheduled in September, he

---

[1] M.C. entered an agreed order of dependency on June 22, 2020. She is not a party to this appeal.

[2] The record indicates that R.H. completed Promoting First Relationships by December 2020.

[3] R.H testified that he lost his housing shortly after L was removed from his care in February 2020. However, he also explained that he had received housing assistance for some time, but had been homeless again for roughly a year prior to the termination trial.

- 4 -

attended five but also had five absences, four of which were unexcused. He was not in compliance with either group session attendance or the requisite UAs, and his progress was considered "not satisfactory." R.H. continued to have sporadic attendance and his progress was also reported as "not satisfactory" through October, November, and December 2021. In April 2022, he was discharged from SUD treatment "due to no contact with individual counselor since December 2021." Also in 2022, R.H. scheduled two separate appointments for an updated SUD evaluation but failed to attend either one.

R.H. consistently visited with L from the time of her removal from his care until she was placed with a relative in Kennewick, Washington on August 1, 2021. At that time, the court established in person visitation at a minimum of once a week for five hours. The visits were to alternate between Seattle and Kennewick, with the foster parents providing transportation to Seattle every other weekend and DCYF paying for the parents to travel and stay in Kennewick on the alternate weekends. The parents were also allowed "liberal" telephone or video contact with L.

In May 2021, DCYF filed for termination of the parental rights of both R.H. and M.C. The fact-finding trial was conducted in October 2023. During his testimony, R.H. admitted to past use of fentanyl, heroin, and methamphetamine but asserted that he did not have a substance use problem and was not actively using drugs at the time of trial. He stated that he did not identify as an addict. R.H. testified that he had never attended a visit with L while under the influence of any substance and noted, "I don't feel that when we're around our daughter that we

should be under the influence of anything." However, he admitted to using both methamphetamine and fentanyl as recently as July 2023. He also testified that he was not engaged in any treatment, such as sober support groups or counseling. R.H. indicated that he had tried to find inpatient treatment without success and asserted that he had been making daily calls to facilities to find a bed. He did not request assistance from the DCYF social worker because he "wanted to do it independently" due to concerns that efforts to obtain treatment were "just going to be used against [him]." R.H. cited homelessness as a barrier to his ability to access treatment.

R.H., one of the foster parents, and the social workers all described the challenges to visitation due to L's placement in Kennewick. According to the visitation schedule, R.H. and M.C. were to travel to Kennewick every other weekend. They initially drove their own personal vehicle to Kennewick, then began to travel there by bus. They stayed in a hotel and L visited with them at the hotel for about five hours. For the Seattle visits, the foster parents drove L the four hours each way.

Several witnesses testified about missed visits in both Kennewick and Seattle. R.H. asserted that none of the missed visits were his fault but, rather, were due to the bus schedule or the foster parents. He missed some visits in Seattle because of "confusion" with the foster parents and when he was late and the foster parents cancelled. One of the foster parents testified that the parents were almost always late to visits. Beginning in March 2022, DCYF imposed a 30-minute cancellation rule, wherein the foster parents could cancel an appointment

if the parents were 30 minutes late. The court also required the parents to confirm their weekend visits on Friday before 6 p.m. When the parents did not confirm, the visits were cancelled. These two rules resulted in several cancellations. The foster family also cancelled due to illness and schedule conflicts.

R.H. testified that L was a "daddy's girl" and very attached to him; he wanted to parent her and did not want her to be adopted. However, he also admitted that he did not have stable housing and did not believe he was capable of caring for L at the time of trial. The foster parents testified that L loves her parents and they love her.

The trial court noted that L is clearly bonded with her parents. Despite this finding, the trial court determined that DCYF had proven the statutory factors for termination by clear, cogent, and convincing evidence: that the parents were currently unfit and termination was in L's best interests. On November 28, 2023, the court entered an order terminating the parent-child relationship as to both R.H. and M.C.

R.H. timely appeals.

ANALYSIS

R.H. challenges the trial court's finding of current unfitness to parent and that the conditions could not be remedied in the near future based solely on his untreated substance use disorder. He also contends the trial court erred when it ruled that termination of his parental rights was in L's best interests.

Parents have a fundamental right to the care and custody of their children pursuant to the due process clause of the Fourteenth Amendment to the United

States Constitution. *In re Custody of S.M.*, 9 Wn. App. 2d 325, 335, 444 P.3d 637 (2019). A court "may not terminate a parent's rights without showing that the parent is currently unfit to parent the child in question." *In re Parental Rts. to B.P.*, 186 Wn.2d 292, 312-13, 376 P.3d 350 (2016). Terminating parental rights without making such a finding violates due process protections. *Id.* at 313. In Washington, the termination of parental rights is a two-step process. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). The first step focuses on "the adequacy of the parents" and requires proof of six statutory elements by clear, cogent, and convincing evidence. *Id.* These elements are

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
> . . . .
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable.'" *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.3d 1132 (1995) (internal quotation marks omitted) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). Only if the first step is satisfied does the court reach the second

step, whether termination is in the best interests of the child. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 577, 257 P.3d 522 (2011). This step "need be proved by only a preponderance of the evidence." *A.B.*, 168 Wn.2d at 911.

Additionally, to satisfy due process, the State may not terminate a parent's rights without showing that the parent is currently unfit to parent the child in question. *B.P.*, 186 Wn.2d at 313. "[S]atisfaction of the six statutory elements of .180(1) is an implicit finding of unfitness, satisfying the due process requirement that a court must find parents currently unfit before terminating the parent-child relationship." *K.N.J.*, 171 Wn.2d at 577.

When reviewing a trial court's decision to terminate parental rights, the appellate court must "determine whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence." *In re Parental Rts. to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016). Because of the highly fact-specific nature of termination proceedings, we defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence. *Id.* The trial court's findings of fact will not be disturbed "'unless clear, cogent, and convincing evidence does not exist in the record.'" *Id.* (quoting *K.R.*, 128 Wn.2d at 144). "We review de novo whether the court's findings of fact support its conclusions of law." *Id.* "Unchallenged findings of fact are verities on appeal." *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 871, 439 P.3d 694 (2019).

I.      Parental Fitness

R.H. contends in briefing that his admitted drug use and failure to complete SUD treatment is not sufficient proof of parental unfitness without "a nexus

between such drug use and [his] inability to safely parent his daughter." He argues that the government may not terminate his parental rights without evidence that he is currently unfit and the conditions cannot be remedied in the near future.

R.H.'s assertion requires examination of two determinations that the court must make before terminating a parent's rights. First, among the statutory requirements, RCW 13.34.180(1)(e) requires proof by clear, cogent, and convincing evidence that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." After considering the statutory elements, the court turns to the issue of parental unfitness which is a separate, nonstatutory prerequisite to termination. *B.P.*, 186 Wn.2d at 312. The two findings are linked, as "[e]stablishing these statutory factors, and factor (e) in particular, by clear, cogent, and convincing evidence, also satisfies constitutional due process for terminating a parent's fundamental liberty interest." *In re Welfare of C.B.*, 134 Wn. App. 942, 952, 143 P.3d 846 (2006).

As R.H. challenges both the trial court's findings that there is little likelihood the identified parental deficiencies will be remedied in L's near future and that he is currently unfit to parent, each is addressed in turn.

A.      Likelihood of Remedying Conditions in Child's Near Future

R.H. asserts that the trial court's finding that there was little likelihood that his parental deficiency could be remedied so that L could be returned to his care in the near future is not supported by clear, cogent, and convincing evidence "where no evidence linked R.H.'s past use of controlled substances to his lack of parenting skills."

RCW 13.34.180(1)(e) focuses on "whether parenting deficiencies have been corrected." *In re Parental Rts. to of E.D.*, 195 Wn. App. 673, 689, 381 P.3d 1230 (2016). "What constitutes 'near future' depends on the age of the child and the circumstances of the child's placement." *C.B.*, 134 Wn. App. at 954. Here, the trial court expressly found that L's "near future" is "no longer than two months." R.H. does not challenge this finding, and as such, her two-month "near future" is a verity on appeal.[4] *See A.L.C.*, 8 Wn. App. 2d at 871.

When considering whether conditions are likely to be remedied in the child's near future, the court may consider the parent's history of parenting and compliance with services. *E.D.*, 195 Wn. App. at 689. These factors are included in the statute as a rebuttable presumption: "A parent's failure to substantially improve parental deficiencies within 12 months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e).

In this case, the trial court's findings of fact give rise to the rebuttable presumption. Its main findings focus not merely on R.H.'s substance use generally, but his "*longstanding untreated* substance use disorder issues." (Emphasis added.) The court noted that L had been out of her father's care for 44 months without either parent making "any progress toward remedying their primary

---

[4] R.H. assigns error to finding of fact 2.20 which includes the finding that L's near future is no longer than 2 months. He asserts, "Insufficient evidence support[s] the trial court's finding that R.H. will not be able to remedy his parental deficiencies with [L]'s near future, and that those deficiencies prevent him from safely and adequately caring for [L]." This assignment of error challenges only the finding of the inability to remedy the parental deficiency, not the timeline.

parental deficiency, substance use disorder." The court also determined that DCYF had met its burden of offering the necessary services to remedy this deficiency. While not invoking the presumption explicitly, the trial court stated, "In the over 36 months since entry of [the dispositional orders], neither parent has substantially improved their parental deficiencies. The parents did not present any evidence at trial that suggests this is likely to change if given additional time."

R.H. does not challenge this finding, nor can he rebut the presumption. In his agreed dependency and dispositional orders, the court required completion of a SUD evaluation and compliance with any recommended treatment, and 90 days of random UAs. R.H. was aware of these requirements. At the time of the termination trial, R.H. had not engaged in any of the court-ordered services to remedy the deficiencies set out in the agreed order of dependency. He admitted that he did not complete the requirements between L's removal from his care in February 2020 and the termination trial in October 2023.

Without evidence of SUD treatment and negative UAs, R.H. could not demonstrate compliance with the court-ordered services or substantial improvement in his identified parenting deficiency. Taking his assertions of sobriety as credible, even disregarding the failure to complete treatment, R.H. would still need to complete 90 days of clean UAs in order to come into compliance with the court's order. This timeline would exceed L's near future of two months. Therefore, clear, cogent, and convincing evidence supports the trial court's finding that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future" as required by RCW 13.34.180(1)(e).

B.      Current Unfitness To Parent

"In order to prove unfitness, DCYF must show that the parent's deficiencies make [them] incapable of providing 'basic nurture, health, or safety.'" *B.P.*, 186 Wn.2d at 313 (internal quotation marks omitted) (quoting *A.B.*, 181 Wn. App. at 61). "The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under [the Juvenile Court Act[5]]." RCW 13.34.020. As noted previously, establishing the requirements of RCW 13.34.180(1), and subsection (e) in particular, by clear, cogent, and convincing evidence implies parental unfitness and satisfies due process for terminating parental rights. *C.B.*, 134 Wn. App. at 952.

Here, R.H. does not challenge the trial court's findings as to RCW 13.34.180(1)(a)-(d) or (f) and, as the analysis in Section I.A *supra* demonstrates, clear, cogent, and convincing evidence supports the finding as to subsection (e). Because proof of these statutory factors implies unfitness and satisfies the due process concerns related to termination of parental rights, the trial court did not err when it concluded that R.H. was currently unfit to parent L.

However, according to R.H., "Drug use alone is not sufficient to show parental unfitness, in the present or in the near future." In support of his claim that a finding of parental unfitness requires a nexus between substance use and an inability to provide the necessary care, R.H. cites this court's opinion *In re Dependency of A.M.M.*, 182 Wn. App. 776, 792, 332 P.3d 500 (2014) for the

---

[5] Ch. 13.34 RCW. The official title of the act is "Juvenile Court Act in Cases Relating to Dependency of a Child and the Termination of a Parent and Child Relationship," but is referred to here as the "Juvenile Court Act" for brevity.

proposition that "if substance abuse alone were basis for terminating parental rights, 'it would have been incumbent on the trial court to say so without equivocation.'" This statement mischaracterizes the court's holding by removing the context. The full text states the following:

> [T]he trial court made extensive findings with respect to [the mother's] substance abuse, [but] there was no finding that [the mother's] substance abuse *alone* provided a basis for terminating her parental rights. Rather, the trial court's reasons for termination are expressed in the conjunctive: the parental deficiencies, considered together, justify termination. Had the trial court determined that [the mother's] substance abuse was alone sufficient to terminate her parental rights, it would have been incumbent on the trial court to say so without equivocation. Because it did not, we decline to affirm on the basis of its extensive findings with respect to [the mother's] substance abuse. Instead, we reverse the trial court's ruling as to [the mother] and remand with instructions for the trial court to consider whether termination is appropriate on the basis of the parental deficiencies of which [the mother] was given adequate notice.

*Id*. at 792-93. When properly contextualized, the statement does not support the assertion that substance use alone cannot be a basis for terminating parental rights. Rather, the court implies that evidence of substance abuse may be a sufficient basis if the trial court "say[s] so without equivocation." *Id.* at 792. Contrary to R.H.'s assertion, *A.M.M.* does not foreclose the reliance on substance abuse alone as basis for terminating parental rights.

R.H. also cites RCW 13.34.180(1)(e)(i) as evidence that the legislature did not intend to allow termination based solely on a parent's substance use. In determining under RCW 13.34.180(1)(e) whether "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future," "the court may consider, but is not limited to,"

- 14 -

> (i) Use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documented multiple failed treatment attempts.

R.H. is correct that this provision links substance use with the inability to care for the child. However, application of this subsection of the statute is permissive, not required, in the court's consideration of whether the identified parental deficiencies will be remedied in the child's near future. *See In re Det. of Nelson*, 2 Wn. App. 2d 621, 629, 411 P.3d 412 (2018) ("The word 'may' is ordinarily regarded as permissive."). A parent's history of substance use and ability to care for the child is only one of several factors outlined for the court's consideration, which include the rebuttable presumption. In this case, the duration of the dependency and the failure of R.H. to complete any of the offered services to remedy his substance use implicated the rebuttable presumption in RCW 13.34.180(1)(e), which does not require the same causal connection as the one set out in subsection (1)(e)(i).

Moreover, L entered dependency after safety concerns arose that were unrelated to R.H.'s substance use. The initial conditions in the shelter care order stated that a UA positive for illegal substances would not result in immediate removal of L from his care. The January 2020 court order requiring R.H. submit to a hair follicle test also stated that a positive test "will not on its own warrant removal." L was removed from R.H.'s care and found dependent following her discovery by police in an unsafe environment and the fact that her whereabouts were at times unknown, which lead to concerns about where she and her father were living. R.H.'s hair follicle tests and UAs conducted at this time were positive

for amphetamine, methamphetamine, morphine, codeine, and heroin. DCYF was concerned about R.H.'s active substance use *and* L's safety in a broader sense. R.H.'s agreed order of dependency acknowledged those safety concerns and expressly stated that L "has no parent, guardian or custodian capable of adequately caring for [her], such that [she] is in circumstances which constitute a danger of substantial damage to [her] psychological or physical development." By signing that agreed order, R.H. affirmatively accepted that assertion.

Testimony at the trial demonstrated that after 44 months of dependency, R.H. showed little insight into the safety concerns that led to L's removal from his care. In an unchallenged finding of fact, the trial court noted that he "was evasive regarding questions about the conditions of the home that [L] and the father were found in when [L] was removed from his care." When asked if he believed that home was a safe place for L to be, R.H. responded, "I don't know how to answer your question."

While this evidence establishes past safety issues, DCYF provided minimal evidence of current safety concerns specific to R.H. None of the witnesses testified regarding the impact of R.H.'s substance use on his ability to parent L. Instead, the testimony focused on safety concerns related to substance use in general,[6] his suspected substance use during a meeting with the social worker,

---

[6] In its briefing, DCYF noted particular concern with respect to R.H.'s admission that he had recently used fentanyl. DCYF argues, "[T]he 2024 Legislature found that fentanyl is a particularly lethal addictive substance that 'poses a unique and growing threat to the safety of children in Washington State.'" According to DCYF, "Because fentanyl use is particularly dangerous to children who may be exposed to this substance while in their parent's care, R.H.'s recent fentanyl use, alone, should carry great weight when assessing his fitness to parent."

We flatly reject DCYF's suggestion that we should weigh one type of illegal substance use more heavily than any other.

- 16 -

and M.C. attending visits while under the influence. R.H. testified that he had never been under the influence of substances during his visits with L. The record does not include any evidence to contradict his testimony.[7] DCYF made allegations of possible substance use during visits with L, but one of the foster parents testified that she had not observed R.H. under the influence.

DCYF's evidence as to any direct impact of R.H.'s substance use on his ability to care for L at the time of trial is deficient. However, the record is clear that R.H. failed to engage in any of the required services or make any demonstrable progress in remedying the identified parenting deficiencies to which he agreed in the dependency order. Additionally, R.H. specifically testified that he was not ready for L to be returned to his care, citing a need for more stability, specifically with respect to housing. When asked whether he had any other areas where he needed more stability before he could care for L, R.H. admitted, "possibly," but could provide no further information. The record includes no evidence as to the length of time R.H. would require in order to establish the stability and housing necessary to care for L.

At the time of the termination proceeding, the identified deficiencies that prompted the finding of dependency persisted without any timeline for improvement. As such, R.H. was unable to provide for L's health, safety, and

---

[7] In its opening brief, DCYF pointed to a social worker's testimony that R.H. appeared to be under the influence of drugs during their meeting as evidence that R.H. had been under the influence of drugs when visiting with L.

During oral argument before this court, DCYF conceded that this characterization of the evidence was incorrect. According to that testimony, R.H. appeared under the influence at a meeting with the social worker. There was no evidence presented that he was ever under the influence during any visit with L. Wash. Ct. of Appeals oral arg., *In re Parental Rts. to L.C.C.-H.,* No. 86140-9-I (Apr. 15, 2025), at 9 min., 10 sec., *video recording by* TVW, Washington State's Public Affair's Network, https://tvw.org/video/division-1-court-of-appeals-2025041289/.

nurture, including "the right to safe, stable, and permanent home and a speedy resolution of any proceeding under [the Juvenile Court Act]" at the time of the fact-finding trial. *See* RCW 13.34.020; *B.P.*, 186 Wn.2d at 313. The trial court did not err in so finding.

II.     Best Interests of the Child

R.H. asserts that contrary to the court's finding, termination of his parental rights is not in L's best interests because they are bonded and have a positive relationship. According to R.H., "There is nothing in the record suggesting that it will make any difference to [L] whatsoever whether she is adopted by her relative caretakers or continues to be cared for as their foster child." We disagree.

Once DCYF establishes the elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence, the trial court must assess whether termination of parental rights is in the child's best interests. RCW 13.34.190(1)(b); *In re Dependency of T.R.*, 108 Wn. App. 149, 166-67, 29 P.3d 1275 (2001). The best interests determination requires a preponderance of the evidence, which is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted. *In re Dependency of J.D.P.*, 17 Wn. App. 2d 744, 755, 487 P.3d 960 (2021). The criteria for establishing the best interests of the child are largely dependent on the facts and circumstances of the case. *Id*. at 760. "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to

rehabilitate [themselves].'" *T.R.*, 108 Wn. App. at 167 (some alterations in original) (quoting *In re Dependency of A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

Here, the trial court acknowledged the bonded relationship between R.H. and L. However, the trial court ultimately noted L's need for permanency. The judge held,

> The court finds that the child has been out of home too long and has been waiting for the parents to get better. The [c]ourt recognizes the parents' deep love and bond with [L] however, it is [L]'s best interest to have her parents' rights terminated and be available for adoption.

The CASA's testimony in particular supports this finding as it focused on stability and permanency in consideration of L's best interests. At trial, the CASA stated,

> Well, the goal of the dependency proceeding is reunification. Unfortunately, in—in this situation [L] has been in out-of-home care since early 2020, since she was an infant. And despite DCYF's efforts to provide her parents with services that would have been helpful in addressing their substance use, to this point they have not participated and made progress in addressing their substance abuse issues. And it does not appear that [L] would be able to safely reunify with them in the near future. And [L] needs permanency. So, I'm supporting [DCYF]'s petition so that she can achieve permanency in her current relative placement.

In addition to the length of time L had been in dependency without progress by her parents, at the time of trial, the then-four-year-old child had been in a stable pre-adoptive placement for two years. As the social worker handling the case at the time of trial explained,

> [L] has been in care four years now[8] and deserves permanency. And she's in a stable and loving home. And she can't have that permanency without terminating the parents' rights. They haven't made any changes behaviorally that would indicate that what brought the child into care would be any different in the near future than it has been throughout the life of the case.

---

[8] The social worker expressly testified that "[e]xcept for a few months when she was in her father's care, [L]'s been in care since she was an infant."

The time that L had been out of her father's care, his failure to engage in the required services and steps necessary to have her returned to his care, in addition to her long-term placement in a pre-adoptive home, amount to a preponderance of evidence demonstrating that termination of R.H.'s parental rights was in L's best interests. Therefore, the trial court's best interests determination was not error.

The record plainly demonstrates that R.H. loves L and wants to parent her. However, by his own admission at the time of trial, he was not ready for his daughter to be returned to him because he was unable to provide for her basic nurture at the time due to his need for housing. More critically, "[w]hen the rights of a child conflict with the rights of a parent, the rights of the child prevail." *T.R.*, 108 Wn. App. at 154. Accordingly, the trial court did not err when it terminated R.H.'s parental rights to L.

Affirmed.

_____

WE CONCUR:

_____     _____