IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of: | No. 82079-6-I |
| G.R.R., | DIVISION ONE |
| A Minor Child. | UNPUBLISHED OPINION |

ANDRUS, A.C.J. — G.R.R.'s mother appeals an order terminating her parental rights. She contends that the Department of Children, Youth, and Families (the Department) presented insufficient evidence to support the termination, and violated her due process rights by failing to provide adequate notice of the basis of the termination. We disagree and affirm.

FACTS

In August 2016, A.R. gave birth to G.R.R. A.R. tested positive for methadone at the time of the birth and admitted to using drugs during her pregnancy. G.R.R. tested positive for amphetamines, methadone, and opiates, and spent the first month of her life in the hospital being treated for withdrawal symptoms.

The Department filed a dependency petition in September 2016 and the court issued a shelter care order placing G.R.R. in the care of her maternal grandmother. The court permitted A.R. to live in the home with G.R.R. and the maternal grandmother

as long as A.R. provided clean urinalysis test results (UAs) and the grandmother monitored her contact with G.R.R. In December 2016, however, one of A.R.'s UAs tested positive for amphetamines and the court ordered A.R. to leave the home.

Shortly thereafter, A.R. engaged in methadone treatment at the South Sound methadone clinic and completed a drug and alcohol assessment at Providence St. Peters. Providence recommended intensive outpatient treatment (IOP). A.R. enrolled in the treatment but Providence discharged her from the program in February 2017 for lack of attendance.

On January 10, 2017, A.R. agreed to an order of dependency for G.R.R. In a subsequent disposition order, the court ordered A.R. to participate in a drug and alcohol evaluation, to submit to random UAs, and to participate in a minimum of two sober support meetings per week, methadone treatment, individual counseling, and Family Preservation Services (FPS) with a parenting coach.

In June 2017, A.R. enrolled in substance abuse treatment and individual counseling at Behavioral Health Resources (BHR). BHR diagnosed the mother with severe heroin and methamphetamine use disorders. Maria Williams, a chemical dependency treatment professional and A.R.'s counselor with BHR, testified that BHR initially recommended that A.R. undergo inpatient treatment. Due to a lack of available inpatient beds, however, BHR recommended that A.R. begin treatment in an IOP program until a bed became available.

A.R. began BHR's IOP Harvest Program in June 2017. This program involved attending group therapy five days a week, attending individual therapy once a week, participating in random UAs, and attending a minimum of two or three sober support

meetings a week. A.R. struggled to remain in compliance with this program. She failed to regularly attend treatment and provided UAs that were positive for illicit substances. A.R. refused to engage in the recommended inpatient treatment.

The Department remained concerned about A.R.'s lack of attendance in the Harvest Program but was aware that she was living out of a car and understood that her living conditions were impacting her ability to fully participate. In August 2017, when A.R. had maintained a full month of compliance with the program, the Department sought a court order permitting A.R. to move back into the home with G.R.R. and the maternal grandmother. Her ability to remain in the home with G.R.R., however, was conditioned on compliance with her treatment services, attendance at Narcotics Anonymous meetings, and providing clean UAs.

The Department learned from BHR that A.R. was not in compliance from September 2017 through January 2018. BHR discharged A.R. from the Harvest Program in April 2018 after she stopped engaging in services. Her BHR counselor opined that A.R. had made no progress in addressing her substance abuse during her treatment there. Williams testified that when discharged, A.R. was neither clean nor sober.

In June 2018, the Department referred A.R. for another chemical dependency evaluation at Northwest Resources. Sandra Kozlowski, a chemical dependency counselor at Northwest, performed this assessment. Kozlowski diagnosed A.R. with a severe cannabis use disorder, a severe opiate use disorder, and a severe alcohol use disorder. She recommended that A.R. undergo a one-year IOP treatment program. Kozlowski asked A.R. to provide a UA sample but A.R. left the building without

providing a sample. Northwest Resources discharged A.R. from its program in July 2018 because she failed to make any contact for more than 30 days.

In August 2018, after being discharged from her methadone program for non-compliance, A.R. relapsed. G.R.R.'s maternal grandmother reported to the Department that she had found drug paraphernalia in A.R.'s room. The grandmother called the police and they arrested A.R. Christine Cavanagh, the social worker assigned to this case, reported that the police found heroin, methamphetamine, a glass pipe, a mirror, and a lighter in A.R.'s room.

When she was released from custody, A.R. returned home, argued with G.R.R.'s maternal grandmother about her relapse, and shoved the grandmother. Police arrested A.R. a second time, for domestic violence assault, and the criminal court entered an order for the protection of the maternal grandmother. Despite the order, A.R. returned to the grandmother's home, and was charged with and pleaded guilty to a violation of the no-contact order.

The Department also learned that the maternal grandmother had allowed G.R.R.'s father to live in the home, despite an active no-contact order between A.R. and the father. It also discovered that the grandmother had allowed A.R. to live in the home at times when she was prohibited from doing so, and had permitted both parents to have unsupervised contact with G.R.R.

The court found that the grandmother, mother and father had colluded to keep G.R.R. with A.R., despite knowing that A.R. was actively using illicit drugs in the room adjacent to the child's room. The court removed G.R.R. from the maternal grandmother's home and suspended visitation for both parents. G.R.R. temporarily

lived in a foster home until the Department placed her with her maternal aunt in November 2018 where she remained at the time of the termination trial.

In September 2018, A.R. underwent an evaluation at Sea Mar, which recommended that she participate in IOP treatment. The following month, the mother started taking Suboxone through the South Sound Sea Mar clinic. But, as with the Harvest Program and Northwest Resources, A.R. stopped engaging in the IOP and was eventually discharged without successfully completing the program.

In January 2019, after a dependency review hearing, the court found that A.R. was not in compliance with the dispositional order. The court modified the ordered services by removing participation in methadone treatment in light of A.R.'s transition to Suboxone, requiring A.R. to engage in parenting classes, and ordering that she abide by the no-contact order. The court further ordered the Department to file a termination petition.

In March 2019, the Department filed a petition to terminate the parental rights of G.R.R.'s parents.[1] At that point, G.R.R. had been out of home for over two and a half years.

In April 2019, A.R. relapsed again. Shortly after this relapse, A.R. sought Suboxone treatment with the Olympia Bupe Clinic. According to Angela Warner-Rein, interim nurse care manager with the Bupe Clinic, the clinic treats opiate use disorder through medication-assisted therapy. It does not provide any type of drug or alcohol treatment. Instead, its clients can return at certain intervals to receive medication, at

---

[1] The father's parental rights were terminated on May 20, 2019. He is not a party to this appeal.

which time the clinic asks them to complete a UA to verify that the patients are taking the medications as prescribed.

While A.R. continued her Suboxone treatment through the termination trial, she frequently missed her appointments and returned to the clinic days or weeks later than her scheduled appointments. In May, June, July and August 2019, A.R. tested positive for methamphetamines and amphetamines. Seeking to verify A.R.'s sobriety, Cavanagh asked A.R. to complete a hair follicle test. A hair follicle test would have shown whether A.R. had used substances in the last ninety days, as compared to a UA, which only shows use within a few days. A.R. did not show up for the hair follicle test.

In November 2019, A.R. completed a drug and alcohol evaluation at Pinnacle Peak as required by her criminal sentence for violating the no-contact order. John Thompson, clinical supervisor at Pinnacle Peak, testified that they recommended that A.R. participate in outpatient treatment for both mental health and substance abuse once a week for six months.

Cavanaugh described this treatment as a "six-month relapse prevention program." In her opinion, this level of treatment was very low and she was surprised by it, given that every other evaluation had recommended intensive treatment. When Cavanaugh received Pinnacle Peak's evaluation, she spoke to the evaluator, Zach Zinn. She learned he had relied exclusively on information provided by A.R.

A.R. told Zinn that her last opiate use had occurred in August 2018; she did not disclose her methamphetamine use or her prior diagnoses of cannabis or methamphetamine use disorders. A.R. also reported that she had previously attended

only one other chemical dependency treatment program. Cavanagh offered to provide collateral information to Zinn for the evaluation, such as A.R.'s prior treatment records, but Zinn told Cavanaugh it would not change his treatment recommendation.

While A.R. began treatment at Pinnacle Peak in November 2019, she was not in compliance with the program in either December 2019 or January 2020 and she had only minimal contact with the program in February 2020. When the COVID-19 pandemic shut everything down, A.R. was unable to engage in its services in March or April 2020. Then, in May 2020, she reengaged through video sessions, and continued with them through August 2020. Cavanaugh testified that this level of treatment was insufficient for A.R.'s needs.

UA testing was unavailable from March 2020 to July 2020 due to COVID-19. When testing did become available, Pinnacle Peak did not do any UAs because it thought A.R. was obtaining these services elsewhere. Cavanaugh asked A.R. to appear for a UA in July 2020; she refused.

Because of the lengthy gaps between A.R.'s UAs and her claim that she was clean, Cavanaugh again asked A.R. to participate in hair follicle tests in May, August, and September 2020 "to show [the Department] that that was true." Cavanaugh had reason to suspect the veracity of A.R.'s claim of sobriety: on two occasions, she received reports that her urine samples had been tampered with. One sample was not even human urine. But A.R. refused to participate in a hair follicle test, claiming she did not have time to do it and did not trust the Department. A.R. testified at trial that she refused because she felt she had already established she was clean.

Throughout the course of the dependency, A.R. also made attempts to engage with family-related services, including the Parent Child Assistance Program (PCAP) and Family Preservation Services (FPS), both of which help parents develop their parenting skills. A.R. engaged with each of these programs for a while, but eventually left each without successfully completing it.

After G.R.R. was placed with her maternal aunt, the court permitted A.R. to have monitored visits with G.R.R. for two hours once a week. After these rights were restored, A.R. visited G.R.R. fairly regularly, though she often arrived late and sometimes failed to show up at all. Due to COVID-19, visits between G.R.R. and A.R. occurred virtually from March to July 2020. These visits generally went well and demonstrated that A.R. and G.R.R. were well bonded and shared a loving relationship.

In August 2020, the court held an eight-day termination trial. After hearing from twelve witnesses, eight of whom the court determined to be credible, the court entered an order terminating A.R.'s parental rights. A.R. appeals.

ANALYSIS

1. Sufficiency of the Evidence

A.R. first argues that there was insufficient evidence to terminate her parental rights. We disagree. The disputed factual findings here are supported by substantial evidence and those factual findings support the trial court's conclusions of law.[2]

Termination of the parent-child relationship involves a two-step process. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, the Department

---

[2] A.R. has assigned error to 63 of the trial court's 166 findings of fact.

must prove the six statutory termination factors set forth in RCW 13.34.180(1) by clear, cogent, and convincing evidence.[3] Id. at 911-12; RCW 13.34.190(1)(a)(i). In addition, due process requires the trial court to expressly or impliedly find by clear, cogent, and convincing evidence that the parent is currently unfit. In re Parental Rights to K.M.M., 186 Wn.2d 466, 479-79, 379 P.3d 75 (2016).

Once the court finds that the Department has proved the elements of RCW 13.34.180(1), the court may terminate parental rights if the Department also proves by a preponderance of the evidence that doing so is in the best interest of the child. RCW 13.34.190(2); K.M.M., 186 Wn.2d at 479.

In reviewing a trial court's decision to terminate parental rights, this court should assess whether the trial court's findings are supported by substantial evidence. In re Parental Rights to D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020). "The trial court's findings will not be disturbed unless there is an absence of clear, cogent, and convincing evidence in the record." Id. Clear, cogent, and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995). We defer to the trier

---

[3] The six statutory elements in RCW 13.34.180(1) are:
    (a) That the child has been found to be a dependent child;
    (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
    (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
    (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
    (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . , and
    (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011). We view the evidence and all reasonable inferences in the light most favorable to the prevailing party. In re Parental Rights to M.J., 187 Wn. App. 399, 407, 348 P.3d 1265 (2015).

A. Likelihood Conditions Will Be Remedied

A.R. first contends that the Department failed to establish that her parental deficiency, her drug addiction, could not be remedied or that G.R.R. could not be returned to her care in the near future. The record, however, amply supports the court's findings that A.R. suffered from severe drug addiction, that she failed to engage in drug treatment designed to remedy the addiction for a four-year period, that she was currently unfit to parent G.R.R, and A.R. lacked insight into how her addiction was impairing her ability to safely parent her child.

RCW 13.34.180(1)(e) requires the Department to prove that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." The statute further provides that "[a] parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied. The court may consider several factors in making this determination, such as whether the parent is using controlled substances rendering the parent incapable of providing proper care for the child for extended periods of time, a documented unwillingness of the parent to receive and complete treatment, and documented multiple failed treatment attempts. RCW

13.34.180(1)(e)(i). The focus of this factor is "whether parental deficiencies have been corrected." K.R., 128 Wn.2d at 144.

The trial court found that 45 months had elapsed since entry of the dispositional order, a finding A.R. does not challenge. The trial court also found that A.R. failed to substantially improve her parental deficiencies in these 4 years, triggering the presumption in favor of the Department. The court also found that A.R. failed to rebut this presumption.

A.R. argues the trial court erred in finding that she had not made significant progress in addressing her parental deficiencies. Specifically, she points to evidence of her year-long sobriety, her participation in the Suboxone program, her treatment at Pinnacle Peak, her stable housing, and the absence of new criminal charges since November 2018. But the trial court considered each of these arguments below and found the evidence not credible or unpersuasive.

First, as to A.R.'s claimed period of sobriety, the trial court found that A.R. was either actively using illicit substances or was, at best, in the early stages of recovery and at high risk of relapse. The record supports this finding. While A.R. testified that she has been sober since October 2019, the court did not find A.R. credible. The evidence demonstrates that over the course of the dependency, A.R. often refused to participate in UAs or provided tampered samples for testing. While she completed a number of UAs for the Suboxone clinic, Warner-Rein, a registered nurse from that clinic, and whom the trial court found credible, testified that the clinic's UAs were done for the limited purpose of verifying that the medication it provided was showing up in

the UA. Their tests were not sent to a lab, were not as accurate as UAs in a compliance-based program, and were susceptible to false results.

Furthermore, during the period of claimed sobriety, A.R. provided at least one UA that was positive for illegal substances and there were large gaps in time where she was not tested at all. When the Department ordered a random UA in July 2020, just one month before trial began, A.R. failed to provide a sample. In an attempt to determine if A.R. was maintaining sobriety, Cavanagh repeatedly asked A.R. to provide a hair follicle sample, which would have verified A.R.'s claimed sobriety. A.R. refused to participate for reasons the trial court found not to be credible. Given this history of nonparticipation in UAs and A.R.'s refusal to submit to a hair follicle test, the trial court was within its discretion to reject A.R.'s testimony that she was clean and sober at the time of trial.

Second, as to A.R.'s claimed participation in drug treatment, four different evaluators recommended that A.R. complete IOP treatment because of the duration and severity of her drug addiction: Providence St. Peters in December 2016, BHR in March 2017, Northwest Resources in June 2018, and Sea Mar in September 2018. A.R. was enrolled in but failed to complete IOP drug treatment with each of these providers. Cavanaugh testified that the fact that A.R. had consistently not engaged in treatment and bounced from one program to another demonstrated A.R. was not committed to recovery over the long term. The trial court found Cavanaugh's testimony credible and persuasive.

Third, as to A.R.'s treatment at Pinnacle Peak, the court found that A.R. had completed treatment with this provider before trial began. But it also found that this

provider's recommended treatment was "woefully inadequate to address the mother's deficiencies given [her] severe substance abuse disorders." It also found that the Pinnacle Peak employees who testified to the program's efficacy lacked credibility and persuasiveness.

These findings are supported by the record. Cavanaugh testified that Pinnacle Peak's evaluation did not consider any collateral information before making treatment recommendations. Jacqueline Boatman, A.R.'s provider at Pinnacle Peak, testified she did not treat A.R. for her methamphetamine addiction and thought A.R. was using Suboxone to combat that addiction. Warner-Rein testified, however, that Suboxone treats only opiate use disorder. In her opinion, A.R. had shown significant progress in managing her opiate use disorder. But, as Cavanaugh testified, A.R. had also been diagnosed with methamphetamine use disorder and cannabis use disorder. Pinnacle Peak did not treat either of these disorders. The trial court had an evidentiary basis for finding that the Pinnacle Peak treatment was not adequate to remedy A.R.'s drug addictions.

Fourth, as for A.R.'s stable housing and lack of new criminal charges, the trial court had a basis for finding these facts insufficient to overcome the presumption in RCW 13.34.180(1)(e). Cavanaugh testified that A.R. had provided no evidence that she was attending sobriety support meetings or that she had acquired a sponsor, as the court required her to do. Nicholas Ackers, A.R.'s boyfriend with whom she was living, testified that he was not concerned that A.R. was using drugs despite A.R.'s own admission's to using drugs while living with him. The court found Ackers's testimony unpersuasive. The record supports the trial court's finding that A.R. lacked adequate

sober supports in her life, notwithstanding her stable housing and her ability to avoid criminal charges.

Finally, A.R. does not effectively challenge the trial court's finding that she lacks insight into her substance abuse problems. This finding is also supported by the record. Despite giving birth to a drug-affected child, suffering countless relapses, receiving multiple diagnoses for severe substance abuse disorders, and starting at least five substance abuse treatment programs, A.R. testified "I honestly don't know if I'm an addict." The trial court found that A.R.'s insight into her substance abuse deficiency "remains entirely unchanged since [G.R.R.] was removed from her care at birth. Her insight into that substance abuse deficiency may have gotten worse since that time."

Each of the court's findings are supported by substantial evidence. Therefore, we conclude that the Department demonstrated by clear, cogent and convincing evidence that there is little likelihood that A.R.'s parental deficiencies could be remedied within G.R.R.'s near future.

B. Integration into a Stable and Permanent Home

Next, A.R. asserts that the Department failed to demonstrate that A.R.'s relationship with G.R.R. diminished G.R.R.'s prospects for early integration into a stable and permanent home, pursuant to RCW 13.34.180(f). She argues that she was able to offer G.R.R. a stable and permanent home at the time of trial. This contention is unsupported by the record.

First, the trial court found A.R. had not corrected the parental deficiencies that resulted in G.R.R.'s initial removal from her care. Second, despite her assertion that

- 14 -

she had stable housing with her boyfriend for two years, there was evidence suggesting that A.R. struggled with housing difficulties and homelessness as recently as early 2020, within months of the trial. Third, at no point has A.R. ever had unsupervised visitation with G.R.R. Cavanagh testified that the Department would expect to see a parent transition from supervised visits to unsupervised visits and then to overnight visits before a child could be returned to their parents. This evidence supports a finding that A.R. was unable, for the entirety of G.R.R.'s life, to provide a stable and permanent home for her and that the situation was unlikely to change.

Moreover, the court found that G.R.R. was in stable placement with her maternal aunt, who was willing to adopt her. The maternal aunt had passed a home study and, as the father's parental rights had previously been terminated, the only barrier to G.R.R.'s adoption was A.R.'s intact legal rights. These findings are unchallenged and are verities on appeal. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

There is substantial evidence supporting the finding that A.R.'s relationship with G.R.R. diminished G.R.R.'s prospects for early integration into a stable and permanent home.

C. Parental Unfitness

Next, A.R. argues the Department failed to establish that she is currently unfit to parent G.R.R.

The Department is "required to prove that the parent's parenting deficiencies prevent the parent from providing the child with 'basic nurture, health, or safety' by clear, cogent, and convincing evidence." In re Welfare of A.B., 181 Wn. App. 45, 61,

323 P.3d 1062 (2014) (citing RCW 13.34.020). The six elements of RCW 13.34.180(1) form the factual basis for a finding of parental unfitness. K.M.M., 186 Wn.2d at 490. If each of those six statutory elements are satisfied, there is an implied finding of parental unfitness. Id. Because each of the statutory elements was proven by clear, cogent, and convincing evidence, we conclude that substantial evidence supports the trial court's explicit finding of A.R.'s current parental unfitness.

D. Best Interests of the Child

Finally, A.R. argues that the Department failed to demonstrate that termination was in G.R.R.'s best interest. A.R. first argues that the trial court erred in reaching the best-interests analysis because the Department failed to establish RCW 13.34.180(1)(e), (f), and A.R.'s parental unfitness. Because the Department has established those factors, we reject any contention that the trial court prematurely addressed whether termination was in G.R.R.'s best interests.

A.R. next contends that she and G.R.R. had a loving parent-child bond and that ending that bond was not in G.R.R.'s best interest. A loving bond between mother and child, however, does not negate the reality that termination may still be the in the best interest of the child.

The trial court found that termination was in G.R.R.'s best interest because, while she and her mother clearly have a loving relationship, A.R. is unable to provide the care and stability that G.R.R. needs. The court further found that G.R.R. is struggling and acting out and that the continued parental relationship impedes G.R.R.'s ability to grow and develop as a healthy, well-functioning human being. These findings are supported by the record.

The court appointed special advocate (CASA), Susan Little, testified that she noticed a change in G.R.R. in the nine months preceding the trial. Little explained that G.R.R. had become anxious and needed constant reassurance from her maternal aunt. G.R.R. did not like to be away from her aunt and constantly asked where she will be staying. Little further opined that if G.R.R.'s future remains uncertain, she expects G.R.R to develop more anxiety and trauma because of the dependency. After four years of dependency proceedings, which included three separate placements, G.R.R. deserves stability. The Department has proven by a preponderance of the evidence that termination of A.R.'s parental rights is in G.R.R.'s best interests.

2. Due Process

A.R. argues that the trial court violated her right to due process when it terminated her parental rights for refusing to undergo hair follicle testing. She contends she had not received notice that a failure to participate in this testing could result in the termination of her parental rights. We disagree.

"The due process clause of the Fourteenth Amendment protects a parent's right to the custody, care, and companionship of her children," which "cannot be abridged without due process of law." In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). Due process requires, at a minimum, that parents have notice, an opportunity to be heard, and the right to be represented by counsel. Id. at 611. We review de novo an alleged deprivation of due process. In re Welfare of A.G., 160 Wn. App. 841, 844, 248 P.3d 611 (2011).

In the context of a termination proceeding, due process requires that parents have "notice of the specific issues to be considered" in order "to prevent surprise,

- 17 -

helplessness and disadvantage." In re Dependency of A.M.M., 182 Wn. App. 776, 791, 332 P.3d 500 (2014) (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)). Both sides "need to know what deficiencies are at issue since the State has to prove the deficiencies to make its case while the parent has to know what allegations to defend against." Matter of Welfare of F.M.O., 194 Wn. App. 226, 232, 374 P.3d 273 (2016). Due process is violated if a parent is held accountable for a parenting deficiency about which he or she was never notified. A.M.M., 182 Wn. App. at 790.

A.R. relies on A.M.M. and F.M.O. to support her argument that the she did not receive proper notice of her need to undergo hair follicle testing. In A.M.M., the Department, seeking to terminate the mother's rights, asserted that she was unfit to parent because "she lacked understanding of her children's developmental needs." 182 Wn. App. at 784. The trial court agreed and terminated the mother's parental rights based on three deficiencies, including the mother's "lack of knowledge regarding her children's development needs." Id. at 792.

This court reversed after concluding that the mother's due process rights were violated because neither the termination petition nor the dependency petition stated that the mother's lack of knowledge regarding her children's developmental needs constituted a parental deficiency. Id. While the services the State provided to the mother included age-appropriate parenting classes, there was no evidence that she was informed that she could lose her parental rights if she did not adequately familiarize herself with her children's developmental needs. Id. As a result, this court

concluded that the mother was not given adequate notice of this parental deficiency. Id.

In F.M.O., the Department took custody of an infant who tested positive for drugs at birth and initiated dependency proceedings, alleging that the mother had parental deficiencies of substance abuse, mental health issues, and a history of domestic violence. 194 Wn. App. at 227. In terminating the mother's parental rights, the court cited the mother's recurring incarceration as an additional basis supporting the termination. Id. at 229.

On appeal, Division Three rejected the mother's assertion that parental deficiencies are limited to those expressly identified in the termination or dependency petition. The court nevertheless concluded there was nothing in the record to indicate that the mother was notified that her frequent incarceration was a deficiency that could be the basis for terminating her rights and reversed the termination. Id. at 232-33.

These cases are distinguishable. Here, A.R.'s primary parental deficiency and basis for the termination of her rights was her substance abuse. Unlike in A.M.M. and F.M.O., where the Department did not provide notice of a parental deficiency that was the basis for termination, A.R. had ample notice that her substance use would be an issue at trial. First, her child was born drug-affected and A.R. admitted to using drugs during her pregnancy and stipulated that her substance abuse was the basis for the dependency order. Many of the court-ordered services were aimed at addressing the substance abuse, including a drug and alcohol evaluation, attendance at sobriety support meetings, random UAs, and participation in treatment programs. Moreover, the termination petition explicitly alleged that A.R.'s parenting deficiencies include

substance abuse issues and that the long-term treatment required to treat those issues made her unfit to parent.

A.R. argues that she had no notice that her refusal to participate in hair follicle testing would result in the termination of her rights because the Department, the CASA, and the trial court all determined that hair follicle testing was a necessary service but never communicated this fact to her. This assertion mischaracterizes the trial court's findings.

Here, the trial court found that random UAs were a necessary service and that she was offered this service throughout the dependency. It also found that A.R. "frequently failed to participate in random UAs." It further found that as late as July 20, 2020, A.R. failed to provide a UA, as the Department requested. As for the hair follicle testing, the court found that it "would have been an acceptable substitute service for random UAs" and would have provided accountability and information about A.R.'s claimed sobriety. But, the court found, despite the Department's repeated offers, A.R. refused to engage in hair follicle testing. At no point did the trial court find that hair follicle testing was a necessary or required service. Nor did it find that her failure to engage in such test was a basis for the termination of A.R.'s rights. The court instead concluded that A.R.'s refusal to participate in this test undermined her credibility, and demonstrated a lack of insight into her substance use disorder and how it impacts her ability to parent.

A.R.'s due process rights were not violated here. Ultimately, it was her failure to comply with the court ordered service plan and her inability to remedy her parental

deficiencies, and not her failure to engage in the hair follicle test, that resulted in the termination of her parental rights.

We affirm.


WE CONCUR:

_Andrus, A.C.J._

_Brennan, J_          _Smith, J._