IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| In the Matter of the Dependency of S.E.L., | No. 82642-5-I |
| A minor child. | DIVISION ONE |
| | UNPUBLISHED OPINION |

COBURN, J. — S.E.L.'s mother appeals an order terminating her parental rights. She claims the trial court erred in finding that the Department of Children, Youth, and Families (Department) offered or provided her necessary Family Preservation Services. She also contends the trial court erred when it shifted the burden to her to produce evidence that termination was not in S.E.L.'s best interests. We disagree and affirm.

FACTS

S.E.L., born in October 2015, is a dependent child who has resided in foster care since March 2018. The basis for S.E.L.'s dependency arose from the mother's cognitive and neurological issues, past trauma, mental health struggles, substance abuse, and inability to safely parent.

The mother suffered serious trauma beginning at birth and continuing into adulthood. She experienced hypoxia at birth or some other "early life or prenatal conditions" that resulted in an unspecified neurodevelopmental disorder, which

Citations and pin cites are based on the Westlaw online version of the cited material.

impacted her speech processing and cognitive abilities. During childhood, she was sexually abused by several family members and has been in multiple "domestically violent relationships." At age 13, the mother began using alcohol, opiates, methamphetamine, PCP, and marijuana, and continued to use those substances over the course of the next 16 years of her life. She has lived a transient existence in several states and, during her history, been diagnosed with major depression, anxiety, posttraumatic stress disorder (PTSD), and post-partum depression.

S.E.L., who has a diagnosis of Static Encephalopathy due to in utero exposure to substances, spent the first two months of her life in the Neonatal Intensive Care Unit. The child then resided with a relative for the next five months while the mother attended inpatient substance abuse treatment.

In 2017, the mother sought out mental health counseling in an attempt to control her PTSD. She "felt as though she was reliving past trauma" and "could not tell at that time if she was back in those previous episodes or in her current state." The episodes lasted for days with no break between them. The mother "suffered from psychotic episodes or breaks where she believed demons or ghosts were attacking her" and S.E.L., and she believed at that time, "she was not able to meet her parental responsibilities during these episodes."

Between the fall of 2017 and February 2018, the mother and S.E.L. lived with a man who subjected the mother to physical, sexual, emotional, and mental abuse, and who physically and emotionally abused the child as well.

In March 2018, S.E.L. and the mother were living at a shelter when the Department received a report from a staff member that S.E.L. had bruising on her ankles and that the mother spoke about "ghosts" and "demons" harming S.E.L.  S.E.L. was taken into protective custody and underwent an evaluation at Children's Hospital where staff determined that "it is highly unlikely that the injuries to the child's ankle would have been non-accidental" and that her injuries "could be consistent with abuse."  The Department filed a dependency petition as to the mother later that month.

On September 14, 2018, following a contested three-day dependency hearing, the trial court found S.E.L. had been abused or neglected, had no parent capable of adequately caring for her, and was in circumstances constituting a danger of substantial damage to her psychological and physical development. Accordingly, the trial court placed S.E.L. in licensed foster care.

In the accompanying dispositional order, the trial court ordered the mother to participate in remedial services, including: a neuropsychological evaluation with parenting component and follow its recommendations; a mental health intake and follow treatment recommendations; a drug/alcohol evaluation and follow all recommendations; age-appropriate parenting classes; and random urinalysis (UAs) once a week (with ETG testing)[1] for 45 days.  The trial court also ordered that the mother be provided visitation with S.E.L. for six hours per week, supervised by the Department, with one weekly visit to occur in the mother's transitional home in Issaquah.

---

[1] Ethyl glucuronide Testing.

Initially, the mother actively engaged in and completed the services the Department referred for her. After consistently providing clean results, she completed her UA requirement in March 2019. In September 2019, Department social worker Rachael O'Riordan was assigned to the mother's case. O'Riordan testified that the mother completed her drug and alcohol evaluation, then engaged in the recommended treatment at the Matt Talbot Center. There, the mother participated in intensive outpatient treatment, where she completed two of the three phases of the treatment program.

The mother completed a mental health intake at Catholic Community Services and received a recommendation to participate in Common Elements Treatment Approach therapy to address her trauma. She followed this recommendation and met with Johanna Portinga for therapy sessions throughout the entire dependency. Portinga testified that the mother made progress in addressing her trauma and treatment goals.

She also completed a neuropsychological evaluation with Dr. Paul Connor, who diagnosed her with unspecified neurodevelopmental disorder and confirmed prior diagnoses. Dr. Connor testified about the mother's troubles with "language functioning" and difficulties with following multistep instructions, and how she needed information broken down in lists or structures to accommodate her concrete learning style. Based on the mother's functioning and history, Dr. Connor recommended that she receive therapeutic interventions to address her PTSD, a psychiatric evaluation, speech therapy, substance abuse treatment,

assistance in applying for disability benefits and, when ready, vocational and rehabilitation services to pursue employment.

Following Dr. Connor's recommendations, the Department referred the mother for a psychiatric evaluation with Catholic Community Services, which she completed. The Department made two referrals for speech therapy but the mother did not engage in that service. It assisted her with applying for Supplemental Security Income (SSI) or Developmental Disabilities Administration (DDA) disability assistance and gave her a list of pro bono attorneys to appeal the denial of those benefit determinations. Because the mother was already engaged in drug and alcohol treatment at the time, it was unnecessary for the Department to give her another referral for such treatment. And, although the mother never indicated that she was ready to pursue employment, the Department inquired with the Department of Vocational Rehabilitation (DVR) about the mother's situation and DVR recommended that "she have a more cleared schedule so that she would have the opportunity to participate in work."

The Department referred the mother to Working Choices for a parenting assessment. Patricia Cunningham, who conducted this assessment in the spring of 2019, testified that the mother was aware of struggles with mental health and sobriety. Cunningham observed a visit between the mother and S.E.L. and did not have any concerns about the visit. She observed a good, affectionate relationship between the mother and S.E.L., and noted that the child "seemed jovial and attached to her mother" and that the "bond between them is apparent." To support the mother's reunification efforts, Cunningham made several

5

recommendations, including: (1) further mental health support, (2) continue working with her current therapist, (3) increase the length of supervised visits, (4) continue working on her SSI and DDA applications, (5) work with the DVR to gain financial support, (6) continue working with the Real Escape from Sex Trade (REST) and/or Organization for Prostitute Survivors (OPS), and (7) in-home parenting skills if reunification was considered. O'Riordan testified that the Department referred the mother for all of these services except for REST and OPS because she was already engaged with those entities.

The Department referred the mother to Project SafeCare to satisfy her obligation to attend age-appropriate parenting classes. Upon completion of those classes, Project SafeCare recommended Family Preservation Services (FPS) for the mother. O'Riordan explained that FPS is "a very flexible service" that helps parents learn everyday life skills such as budgeting, navigating transportation, keeping a home clean, creating hygiene routines, and making appointments. Even though the dispositional order did not require the mother to follow recommendations made from the parenting class provider, the Department referred her for FPS multiple times.

In 2018, the Department initially referred the mother to an FPS provider. Although the mother met with the provider, "the provider didn't feel like she had time to participate in the services and his times didn't align with hers." O'Riordan explained, in that instant, the mother's "only availability was later in the evening around the weekends. And that particular provider wasn't working on those hours." The Department made another referral for FPS early in 2020 "[b]efore

the pandemic hit in March of 2020" but "in that particular situation, the provider could not reach" the mother. O'Riordan testified that the Department also attempted to refer FPS between 2018 and 2020, however, "[t]here just weren't providers available in the area" for her.

Beyond the services that the Department was required to provide pursuant to the dispositional order, the Department tried to help the mother with housing resources after she left her housing in late 2019 or early 2020 "because she felt unsafe" after seeing "an abusive" former partner "knocking on her door." The mother began staying at shelters and initially gave social worker O'Riordan permission to talk to the shelter staff, "but then revoked her consent for [O'Riordan] to talk to the shelter staff." At that point, the Department lost its ability to consistently verify where the mother was living and noticed "a decline in her engagement and participation in her services."

The Department provided her with transportation assistance, as O'Riordan noted: "She had ORCA cards, bus tickets. I've transported her [to] her visits myself as well." And, in recognition of the mother's learning disabilities and circumstances, the Department provided the mother notice of referrals and service providers through service letters, emails, phone calls, text messages, and in-person conversations.

While the mother was found to be in compliance with services for most of the review hearings throughout the dependency, she was found to be making full progress at only one of the six review hearings over three years. Based on this

history, the Department filed a petition to terminate the parental rights of S.E.L.'s parents in April 2020.[2]

In September 2020, the mother reported that "some man unknown to her had injected her with fentanyl and some other drug and then had kidnapped her," requiring her "to go into detox." After leaving the detox facility, the mother dropped out of contact with the Department, S.E.L., and her service providers. The Department and many of the service providers were "all in communication" but did not "have a reliable way of reaching her." Portinga testified that the last interaction she had with the mother "with any therapeutic value was" on September 25, 2020.

Although the mother participated in most of her visits with S.E.L. until September 2020, she missed S.E.L.'s birthday in October 2020, and had only four visits with the child between January and February 22 of 2021, then dropped out of contact again. As of late 2020, the mother still refused to tell the Department where she was living and would only say that "she was staying with friends."

The trial court held a five-day termination trial in March 2021.[3] The mother failed to appear for the trial but was represented by counsel during the proceedings. Kaya Wynn, a CHERISH social worker,[4] testified about working

---

[2] The father later relinquished his parental rights to S.E.L. He is not a party to this appeal.

[3] The trial was conducted remotely via Zoom due to COVID-19 protocols, after the trial court denied the mother's counsel's motion to continue trial until in-person trial resumed in the courtroom.

[4] CHERISH is an organization that supports children in out-of-home placement or who have experienced such placement.

with S.E.L. and the mother since the fall of 2019.  According to Wynn, S.E.L. suffers from indiscriminate attachment, emotional and physical regulation, self-harming, and needs an attentive primary caregiver to help protect her.

O'Riordan spoke about being assigned to the mother's case from September 2019 to December 2020, the Department's delivery of services during that time, her interactions with the mother, and filing the termination petition.  She testified mental health and substance abuse issues were the mother's primary parental deficiencies and that FPS would not be capable, alone, of remedying the mother's deficiencies in the near future.

Department social worker Danielle Benedict testified to being the caseworker of this dependency since December 2020.  Benedict discussed her difficulty in being able to reach the mother and how she suggested meeting the mother where she was staying at the time in an effort to reduce a transportation barrier, but the mother declined.  They did meet once in January 2021 but, afterwards, Benedict had no information about where the mother was living.  Benedict testified that, at the time of trial, the mother's existing deficiencies included (1) "a tremendous difficulty in being able to tend to her own basic needs," (2) "unmet mental health needs," and (3) "unmet substance use needs" and "lack of sobriety."

Janette Ambauen, the court appointed special advocate (CASA), testified about advocating for S.E.L.'s behalf since June 2018, how the child had been dependent for 36 months, and why she felt the parental rights should be terminated.  Ambauen testified termination was appropriate because the mother

was never "able to really establish mental stability," "struggled with her own personal safety and stability," and the unimaginable "implications of [those deficiencies] for parenting."

The trial court found that the mother had not "progressed enough in her mental health treatment to safely parent" S.E.L. Regarding the Department's provision of services and FPS, the trial court found that

> The Department referred the mother to Project Safecare at Washington National Counseling for age appropriate parenting classes. The mother completed those classes, and the provider recommended she participate in Family Preservation Services (FPS), an in-home parenting support/skill building program, to work on organization of her services, assist her engagement, and communicate her needs/barriers. The mother was referred to FPS services in 2018, and was re-referred in 2019, but each time the provider reported an inability to align with mother's availability and schedule.
> . . .
>
> All necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided to the mother. During the course of the dependency no party has indicated the need for remedial services other than those addressed above.

Despite these findings and its ultimate determination, the trial court acknowledged and wanted the record to reflect that

> [The mother] is the victim of unspeakable trauma from which she was not protected. The abuse came from all sides: boyfriends, family members, and strangers. [S.E.L.] witnessed this abuse and was sometimes the victim of it as well. [The mother] lives with the mental health effects of this past trauma every day, and this posttraumatic stress leads to psychotic episodes that must be terrifying for her. And she has difficulty functioning with everyday life as a result.
> Someday when [S.E.L.] looks back at these records, which I'm sure she will, I hope she sees what the Court does, which is that her mother loves her and wants to be a parent to her, but she is currently unable to safely do it.

The trial court terminated the mother's parental rights to S.E.L. on April 15, 2021. The mother appeals.

DISCUSSION

The mother assigns error to the trial court's finding that the Department provided her with "all necessary services" as required by RCW 13.34.180(1)(d). The service that was not provided, she claims, was FPS. She also contends that the trial court improperly shifted the burden to her to produce evidence that termination was not in S.E.L.'s best interest. We discern no reversible error.

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Termination of the parent-child relationship involves a two-step process. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). To terminate parental rights, the Department must first establish the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. Id. at 911-12. Once the trial court finds that the Department has proven the elements of RCW 13.34.180(1), the court may terminate parental rights if the Department also proves by a preponderance of the evidence that doing so is in the best interest of the child. In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016).

In reviewing a trial court's decision to terminate parental rights, we assess whether the trial court's findings are supported by substantial evidence. In re Parental Rights to D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020). "The trial court's findings will not be disturbed unless there is an absence of clear, cogent,

and convincing evidence in the record." Id. Clear, cogent, and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995). "Because of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.' " K.M.M., 186 Wn.2d at 477 (quoting In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)).

RCW 13.34.180(1)(d) requires the Department to prove that it has expressly and understandably offered or provided "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." "Necessary services" are those services " 'needed to address a condition that precludes reunification of the parent and child.' " K.M.M., 186 Wn.2d at 480 (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)). To meet its statutory duties, the Department must at least provide the parent with a referral list of agencies or organizations that provide necessary services. Hall, 99 Wn.2d at 850.

The mother's first challenge depends on the premise that FPS was a necessary service. Though the skills the mother could learn by engaging in FPS would be beneficial to any parent, they were not needed to address the two conditions that precluded her reunification with S.E.L. Said differently, completing FPS alone would not have remedied the mother's mental health and substance abuse parental deficiencies. "[T]ermination is appropriate if the service would not have remedied the parental deficiency in the foreseeable future." D.H., 195 Wn.2d at 719. FPS was not a necessary service.

12

She acknowledges that the Department referred her "to an FPS provider twice," however, the mother maintains that the Department made no efforts to better coordinate her services to allow for FPS to be provided and failed to provide FPS at a time when she was engaged and progressing. These contentions incorporate her challenge to the trial court's findings that she "was referred to FPS services in 2018, and was re-referred in 2019, but each time the provider reported an inability to align with mother's availability and schedule." We agree that this finding is not supported by the record in terms of the referral dates and basis for the mother's failure to engage in FPS.

Despite this error, the evidence in the record establishes that the Department expressly and understandably offered FPS to the mother first in 2018, again in 2020 before the pandemic began, and at least once more between 2018 and 2020. In the first instance, the mother met with the FPS provider but was available only "in the evening around the weekends" while the FPS provider was not. The Department then continued to seek an FPS provider to meet with the mother on the weekends but could not find any "available in the area." Finally, when the Department located an FPS provider in early 2020, the provider reported not being able to reach the mother. The record shows that the Department made multiple attempts to provide the mother FPS but that service was not "reasonably available." Accordingly, we conclude that FPS did not constitute a "necessary service" within the meaning of RCW 13.34.180(1)(d).

Alternatively, the mother argues that the Department was statutorily required to report to the court its inability to provide FPS to her pursuant to RCW

13.34.025.  Without deciding whether the Department has an obligation, we reject the mother's argument because it hinges on FPS being either a court-ordered service or a necessary service.  It was neither.[5]

Substantial evidence supports the trial court's conclusion that the Department proved by clear, cogent, and convincing evidence it offered the mother services as required by RCW 13.34.180(1)(d).

Next, the mother asserts that in making its finding as to the child's best interests, the trial court considered her failure to appear at the termination trial and present evidence.  This, she avers, constituted improper burden-shifting and relieved the Department of its burden to procure a finding based solely on the evidence it produced and not based on a parent's failure to produce evidence.  We disagree.

"Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself.' "  In re Dependency of T.R., 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (alternations in original) (quoting In re Dependency of A.W., 54 Wn. App. 22, 33, 765 P.2d 307 (1988)).  Here, after considering all of the evidence presented, the trial court found termination to be in S.E.L.'s best interest:

---

[5] Similarly, although the mother assigns error to several of the trial court's other factual findings, we need not address them because her basis for doing so turns on the Department's purported failure to provide FPS.  Again, there was no such failure here.

> The Department and CASA testified in support of termination of the mother's parental rights as being in the child's best interest and the court agrees. <u>The mother did not appear or present evidence</u>. The mother will not be able to remedy her parental deficiencies within the near future. The child has a right to a safe, stable, and permanent home and to a speedy resolutions of this termination proceeding. The Court also finds that it is in [S.E.L.'s] best interest to have permanency as soon as possible. She is at the age where she can verbalize her desire to have a permanent home, where she can feel safe. The Court finds that given the length of time [S.E.L.] has been in dependency—more than twice that of the national guidelines—is too long and it is to the point that it threatens her long-term well-being and sense of security. She cannot wait any longer.

(Emphasis added.)

The mother points to the underlined portion of the above finding, and nothing else in the record, to support her notion that "the trial court did indeed consider [her] failure to present evidence as a basis for its determination." While " 'the burden of proof in a termination trial is on the Department and should never be shifted to the parent' " to "protect the vital interests at stake," In re Termination of M.A.S.C., 197 Wn.2d 685, 698, 486 P.3d 886 (2021) (quoting Santosky, 455 U.S. at 760), there was no burden-shifting to the mother here. Rather, our independent review of the entire record and the oral ruling do not suggest that the trial court relied on anything but admitted evidence to make its best interest determination.

We defer to the trial court's advantage in having witnesses before it, which is important in proceedings affecting the parent and child relationship. In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999). We will uphold a trial court's determination as to a child's best interest so long as such a finding is supported by substantial evidence. Id. Based on this record, we

conclude substantial evidence supports the trial court's finding that termination was in the best interest of S.E.L.

We affirm.

_Coburn, J._

WE CONCUR:

_Bowman, J._          _Mann, C.J._