# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>M.J. | No. 83704-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — The trial court terminated S.J.'s parental rights to his child, M.J., following a two day trial in December 2021. S.J. appeals. At issue is whether the Department of Children, Youth, and Families[1] (Department) satisfied its burden under RCW 13.34.180(1)(f) to prove that continuation of the parent-child relationship would diminish M.J.'s prospects of permanent placement, and whether the termination of S.J.'s parental rights was in the best interests of the child. We affirm.

I

A

S.J. was raised by his mother without learning the identity of his father. He has an older brother and older sister. When he was in the ninth grade, S.J. dropped out of school and started working at a carpentry company, as he

---

[1] The Department of Children, Youth, and Families (DCYF) took over child welfare duties that were formerly the responsibility of the Department of Social and Health Services (DSHS), effective July 1, 2018. RCW 43.216.906. This opinion references the "Department" to mean DSHS before July 1, 2018, and DCYF after July 1, 2018.

explained, " 'I learned so much and was able to help my mother with bills too.' " S.J. continued in this field until his mid 20s when he was retrained as a heavy machine contractor.

S.J. dated C.B. for approximately three years. In the third year of the relationship, on June 23, 2011, C.B. gave birth to M.J. S.J. was the father. Before M.J.'s birth, C.B. had lost custody of to two other children. C.B. relinquished her parental rights to M.J. before this proceeding, and she is not a party to this action.

Between May 2012 and June 2013, C.B. filed three separate petitions for an order of protection against S.J., alleging domestic violence. Each of the three were dismissed, one for C.B.'s failure to appear, and two because the court did not find sufficient evidence of domestic violence.

In July 2012, a Department social worker stated there was an open Child Protective Services investigation into C.B. for physical abuse, and that M.J. "has been in the physical care and custody of [S.J.] and continues in the father's care currently. The residence is appropriate, clean, child friendly and well stocked with necessary furniture, clothing, diapers, formula and other needs required to care for the child."

When M.J. was approximately four years old, S.J. moved himself and M.J. to New Mexico to live with S.J.'s mother. S.J. worked in construction and his mother assisted with M.J.'s care. S.J.'s mother passed away. S.J. and M.J. left New Mexico when M.J. was in the first grade.

In March 2019, S.J. was living with M.J. in Snohomish county and attempted to reconnect with C.B. so that M.J. could meet his mother. S.J. and M.J. were staying at a hotel, when C.B. came to visit M.J. S.J. said that he and M.J. fell asleep and that he woke up to find C.B. and M.J. gone. C.B. had not told him where she was going, and he had no idea where they were. S.J. testified that he called the police, but that police said they could not become involved because there was not a parenting plan in place. A police report from this incident is not in the record before this court.

C.B. travelled to Multnomah County in Oregon with M.J., where she sought a restraining order against S.J.

On June 13, 2019, the Oregon court granted C.B. a one year restraining order against S.J. that gave her custody of M.J. S.J. testified he was not able to travel to Oregon to contest the order. In obtaining the restraining order, C.B. alleged that S.J. was "under [the influence of] a heavy amount of illegal drugs such as meth[amphetamine]," and had "no stable living as far as I know." C.B. alleged that on approximately April 17, 2019, M.J. accidentally spilled a soda during the night, "and when [S.J. saw] it in the morning [he threw] my son so hard to the floor that he hit his head on the wall and [my son] told me [he saw] black[,] and the lamp across the room fell."[2] C.B. further alleged that on April 25, 2019, S.J. had forced

_____

[2] The Attorney Guardian Ad Litem stated in her report for the termination proceedings that early in the dependency, M.J. "repeatedly recounted one incident with his father, involving a spilled soda – where [S.J.] pushed him down and hit him."

her to engage in sexual activity in the bathroom of their hotel room while M.J. watched television in the next room, and that S.J. was under the influence of methamphetamine at the time. C.B. also alleged that on May 3, 2019, S.J. "threatened to do bodily damage to me and my son if [I] ever tried to leave him or take my son for fear of harm." C.B. expressed fear that "[i]f [S.J.] finds out where [I']m at there is no [doubt] in my mind that in his current drug induced [psychotic state] of mind that he will come after us and kill me and take my son or kill us both."

On August 8, 2019, the Department was notified that S.J. had allegedly threatened to kill C.B. and M.J. C.B. made this allegation while seeking domestic violence services in Skagit County. At that time, a domestic violence advocate reported that M.J. stated it was " 'not ok for your dad to threaten to kill his mom and his kids. Or your dad to hurt you because he's mad at you.' " M.J. also stated that S.J. often throws him on the ground because M.J. makes mistakes and that "it happens all the time." The Attorney Guardian Ad Litem later stated in her report for the termination trial that she was "confused about the phrasing of this intake, as it appears, from the limited information provided in discovery . . . that [M.J.] may be repeating information told to him – based on the wording of the quoted language."

On October 1, 2019, S.J.'s sister-in-law sought an antiharassment restraining order against S.J. According to the petition, S.J. was living with his brother and sister-in-law at the time. In the petition, S.J.'s sister-in-law stated that

4

"[S.J.] has a drug problem and was asked to take a drug test in order to continue staying with us," and alleged that S.J. had run over her dog, made threatening statements to her, drove through a gate, broken things "like cabinetry and a dresser," and left trash on her property. An antiharassment order was granted, effective through October 15, 2020. The order states that "based upon the petition, testimony, and case record, the court finds that the respondent committed unlawful harassment."

On October 6, 2019, law enforcement found M.J. alone in a car outside a casino, within reach of a large quantity of drugs, and took him into custody. C.B. was arrested and, as of October 8, 2019, incarcerated at the Snohomish County Jail on charges of manufacturing-delivery of amphetamine-methamphetamine with intent, leaving a child unattended in a parked vehicle while entering a liquor establishment, possession of drug paraphernalia, endangerment with a controlled substance, and third degree theft. The Department did not return M.J. to S.J.'s care at that time because of the Oregon restraining order.

B

The Department filed a dependency petition on October 8, 2019. A shelter care order was entered on October 10, 2019. In the shelter care order, S.J. appears to have agreed to participate in a drug and alcohol evaluation, random urinalysis (UA) testing, and parenting classes. He did not agree to a domestic violence assessment and the court reserved ruling on that requested service until

the dependency factfinding hearing. S.J. attended the shelter care hearing, but a transcript of that hearing is not before this court.

On November 14, 2019, S.J.'s visits with M.J. were suspended because M.J. displayed fear of his father. The Attorney Guardian Ad Litem stated in her report that "[M.J.] was exhibiting significant anxiety at the prospect of visitation with [S.J.]. . . . [M.J.] was anxious about unsupervised visits with his father, due to fear that his father would abscond with him." At that time, the court also ordered that M.J. begin counseling and that therapeutic visits between S.J. and M.J. should begin upon recommendation of the counselor.

M.J. began seeing a therapist, Sara Wilson, in December 2019. She said he was referred to her because M.J. had disclosed physical abuse, allegedly perpetrated by S.J., sexual abuse, allegedly perpetrated by an older child, and neglect, allegedly by his biological mother. M.J. met with Wilson on a weekly basis at times, and at the time of the termination trial was meeting with her every other week. When M.J. started treatment, his symptoms included flashbacks where "he would have scary memories, he would have bad dreams, he would get flooded with emotions when reminded of different aspects of his trauma." When he experienced these intrusive symptoms, he would hit himself, scratch his face, be emotionally explosive, and have a hard time calming down and regulating his emotions.

The dependency trial occurred on July 8 and 9, 2020. S.J. attended the dependency trial. The transcript of that hearing is not in the record before this court. Sean Wolter, a DCYF social worker, testified at the termination trial that S.J. admitted at the dependency trial to using methamphetamines. On July 16, 2020, the court entered an order finding M.J. dependent as to S.J. The order of dependency found that S.J. was using methamphetamines, was unable to appropriately regulate his emotions, was unable to provide a stable and safe environment or stable housing or consistent access to school for M.J., both of which were detrimental to the development of M.J., could not adequately care for M.J, and that S.J. had untreated mental health problems. Pursuant to RCW 13.34.130, the court ordered S.J. to complete a drug and alcohol evaluation, random UA testing, a parenting assessment, a domestic violence assessment, and to follow all recommendations of evaluators and service providers. Christina Pastor, a social service specialist, and supervisor of the social worker assigned to this case, testified at the termination trial that she did not recall if S.J. had completed any UAs before the dependency trial and that she did not recall if anyone other than C.B. had brought up allegations of substance use by S.J.

S.J. completed an initial drug and alcohol assessment with Catholic Community Services on August 5, 2020. A UA was collected, which tested positive for THC (tetrahydrocannabinol), but negative for amphetamine. At intake, S.J. disclosed regular use of cannabis, at " 'a quarter gram' " weekly and stated his last

7

date of use was August 5, 2020. Regarding use of stimulants, the intake form states,

> Onset of stimulant use occurred at age 20 with regular use beginning at that time. Use from age 20-25 reported to increase from twice monthly to daily use. Amount used was not reported. Period of sobriety reported for six years when his son was born, relapsing "about two years ago." Use was reported to return to "almost daily" from 38-40. Date of last use reported as 7/10/20.

The particular stimulant S.J. reported using was methamphetamine. Substance Use Disorder Professional Adult Counselor Trista Garcia diagnosed S.J. with severe amphetamine substance use disorder. Garcia recommended that S.J. attend an American Society of Addiction Medicine Level 2.1 Intensive Outpatient Treatment Program, which includes three group sessions per week at two hours per session for approximately 12 weeks, and individual sessions throughout treatment. This was to be followed by outpatient treatment, level 1.0, which includes three to six months of weekly group sessions and individual sessions as required. The latest outpatient group meets from 6:00 p.m. to 8:00 p.m. Garcia mailed these recommendations to S.J. S.J. did not complete the treatment recommendations.

S.J. was referred to a provider for a parenting assessment on August 18, 2020. S.J. did not complete the assessment because, as he testified, it was "[t]oo far away. Too much paperwork."

On October 22, 2020, S.J. was referred to the Social Treatment Opportunity Program (STOP) for a domestic violence perpetrators assessment and treatment. S.J. did not complete the assessment at that time and the referral expired.

On April 5, 2021, S.J. completed a parenting assessment with Dori Guterson, a licensed clinical social worker. The assessment was completed in 10 hours over 8 weeks. M.J. was present for 3 hours of that time. Guterson stated that S.J. appeared "not guarded, secretive, or elusive in any way[,] however[,] in reading through the court and [Department] reports it appears he left out many facts." Guterson's report stated she "did not find any traits that brought me to pause or believe that these said traits would make [S.J.] be unable or unfit to parent his son." Further, "[S.J.] is capable of providing adequate and consistent parenting for his son. He is very protective and in our conversations, appears to really know and understand his son." Guterson noted that "[S.J.] is skilled in reading, interpreting, and attending to his son's cues and moods. . . . [I]t was clear to me that he observes his son and is in tune with his son's emotional and physical needs." She stated that S.J. and M.J. would benefit from family counseling. Guterson stated, "[S.J.] may have a challenging time admitting his faults, but would strive to be a positive role model for his son. [S.J.] works hard at providing a financially stable life for his son and takes pride in this." When she wrote the report, Guterson was under the impression that S.J. was attending drug and alcohol classes two times a week. Guterson testified that she would be concerned to hear

that S.J. did not engage in substance use treatment and disappointed to hear that S.J. had not engaged in family counseling.

S.J. was referred to STOP for a Domestic Violence Assessment a second time on April 7, 2021. S.J. did not complete the assessment. S.J. traveled to the STOP office, where he received the paperwork to for the assessment but did not complete it because he became upset that it requested information regarding his driving history, information he felt was unnecessary.

C

On May 13, 2021, the Department filed a petition for termination of the parent-child relationship between M.J. and S.J. The petition stated that S.J.'s parenting deficiencies included "lack of parenting skills, domestic violence, substance abuse issues, and lack of safe and stable housing." The petition stated "within Snohomish County, the father has had seven (7) criminal matters related to domestic violence." The record before this court does not contain further information about S.J.'s alleged criminal history. In Guterson's report, S.J.'s criminal history is described as a "Temporary Restraining Order that was in place for 2 weeks, then dropped."

On July 23, 2021, S.J. was referred to the Institute for Family Development for "Triple P" services. The referral form stated, "The father has completed a parenting assessment and [it] was determined that he would benefit from completing parenting classes to help the father learn appropriate emotional

regulation and parenting skills to appropriately meet the needs of the youth. The youth has expressed that he struggles with connecting on a meaningful manner [sic] with the father during visitation and the father does not believe that he currently has an[y] parental deficiencies." On August 1, 2021, Institute for Family Development Therapist Giannina Bartholomew called S.J. He answered the phone, and when the therapist offered different times to meet, S.J. responded, " 'so call me when you have free time.' " Bartholomew explained that they were in-home services, which S.J. stated he found weird. S.J. then said he " 'didn't need this' " and hung up the phone. S.J. did not make contact again, so the referral was closed.

C.B. relinquished her parental rights after a settlement conference on December 9, 2021.

D

Trial on the termination of S.J.'s parental rights was held on December 20-21, 2021.

1

The Department presented substantial evidence of M.J.'s needs. At the time of the termination trial, M.J. was living in a licensed foster home. This was not a permanent placement, but the foster mother Laura Cohn testified that M.J. is welcome there until he has a permanent placement. Cohn testified that when M.J. was first placed in her home, he suffered from three to five dysregulation episodes

a day where it would take Cohn 45 minutes to an hour to sit with him and help him to calm himself. M.J.'s episodes had become much less frequent by the time of the termination trial, but could still be triggered by unknown, unanticipated changes in schedule, and transitions. Cohn testified that M.J. does well when he knows what to expect in a day, and that he "really has a sense of confidence around helping around the house and being able to contribute to the people around him" that "extends to the classroom as well." Cohn testified a large portion of time is spent supporting M.J. and making sure he feels comfortable with what to expect in the upcoming time. Cohn testified that after visits with S.J., M.J. "regresses a little bit." In the time before the trial, M.J. had stomachaches and anxiety, and "a couple episodes where he's come home and been really angry." Cohn stated there have been "several times where he's had outbursts and been crying and inconsolable, and said things like, 'Why did I get bad parents,' and, 'Why am I just this unlucky,' and 'Why am I in foster care.' "

M.J. has been diagnosed with posttraumatic stress disorder (PTSD) and attention deficit hyperactivity disorder (ADHD). Sara Wilson, M.J.'s therapist, has treated him with trauma-focused cognitive behavioral therapy (TF-CBT). TF-CBT is a treatment that includes multiple steps: developing coping skills to help M.J. regulate himself; gradual exposure to the traumatic things M.J. has been through, so he can talk about it; assessing and developing safety skills; and emotional regulation. Wilson testified that at the time of trial, M.J. was in the gradual

exposure phase of TF-CBT for over a year, which "has been pretty difficult for him." Wilson testified that over the course of treatment he has developed positive coping skills and his self-harm has gone down. M.J. is not done with treatment. Wilson recommended further treatment, and said that "if he continues with therapy, especially as stability increases in his life, I have no doubts that he will graduate from [the gradual exposure] stage." Further, she said that with stability within the next six months and continued treatment, she could see M.J. moving on from this stage within the next year, and that she was not sure he would be able to do so without stability. And Wilson testified that M.J. having continued instability in his life would "absolutely" impact his emotional well-being. According to Wilson, having no access to his dad might be challenging for M.J., and "[i]t might cause some attachment wounds." She said it was impossible to weigh those harms against each other.

At the time of the trial, M.J. was on an Individualized Education Program (IEP), a program designed to help children that are falling behind educationally or behaviorally. M.J. was falling behind in his reading and writing skills. To manage M.J.'s educational needs, his foster parents have frequent contact with his school.

2

S.J. testified at the termination hearing. He sometimes was defensive or uncooperative and did not want to answer questions that he did not think were relevant. Multiple times, the court had to remind S.J. to avoid commentary and

13

answer the questions he was asked. S.J. interrupted the proceedings at several points.

S.J. never completed a domestic violence assessment. At the termination trial, S.J. testified that he had never yelled at C.B. or called her names, and that he had never been physical with her, except when trying to protect himself by "pushing her away from me, stuff like that." S.J. testified that C.B. "was the one being physical with [him]." He did not feel he needed to complete a domestic violence assessment and stated, "It doesn't pertain to any of the case. I passed everything else, so why do you stabbing[,] stabbing, stabbing, stabbing." Wolter testified that M.J.'s previous disclosure of physical assault by S.J. caused the Department to be concerned for M.J.'s safety with S.J. And Wolter testified that a domestic violence assessment is necessary for S.J. because of prior protection orders "that are in place towards the mother, the child, and other relatives,[3] as well as . . . the disclosures of possible physical abuse from the child." Wolter stated he believed the assessment could be beneficial because "during the assessment they would be able to conduct a brief evaluation of [S.J.'s] mental health to determine if there are any possible concerns regarding his mental health . . . and how that could possibly be affecting his behavior."

---

[3] Despite Wolter's reference to other "relatives," other than orders regarding C.B. and M.J., the record contains evidence only of an antiharassment order regarding S.J.'s sister-in-law.

S.J. completed a substance abuse intake with Catholic Community Services, but there is no evidence he entered treatment. When asked if he had testified at the dependency trial that he had used methamphetamine the day prior, S.J. responded, "I don't recall. Possibly." S.J. was asked if he had told Guterson that he was engaged in drug and alcohol classes at the time of her parenting assessment. He responded, "At the time I was trying to get through the thing, yes, but that's just more of a hoop. That's ridiculous to me, drug UA, and all that, so I am not going to sit there and jump through hoops for nothing." When asked about substance use at the termination trial, S.J. responded, "Yes, once or twice, maybe" for cannabis use and "I don't recall" for methamphetamine use. When asked if he had ever admitted he used illegal substances, S.J. responded, "Maybe just to shut you guys up possibly." When asked specifically when he had last used methamphetamine, S.J. was not able to give even a rough estimate of when he had last used, stating, "I don't know the dates . . . so 2020, 2021, I don't know the year exactly either." When asked how many UAs he had taken, S.J. responded "Three, four. I am not wasting my life on ridiculous stuff like that." When asked when he had last taken a UA, S.J. stated, "I don't have time to think about stuff like that, nor do I want to. Time, I will never get back time spent with my son."

Wolter testified that he attempted to contact S.J. to ask him to take a UA test "this month," however he did not receive a response because the text message would not go through. Wolter testified that he asked S.J. to complete a UA test in

late October or early November 2021, and that he had offered to provide the UA as well as drug and alcohol treatment program options in the Tacoma area, closer to where S.J. was working. In total, Wolter testified that since March 2021, he had requested S.J. complete four or five UAs. S.J. did not complete them.[4] When asked why he thought the services were ordered for him, S.J. said, "It's about the money, just about the system. . . . Hearsay is all it is." S.J. said he would participate in the services if he were able to attend them, and when asked what was keeping him from attending them, S.J. said, "Myself. Logic." When asked if he would comply if offered a UA on that day, S.J. said, "Hell no. I am at home. . . . I am going to work, so absolutely not. . . . Would you waste your time for nothing? No you wouldn't."

Wolter testified that active methamphetamine use would hinder S.J.'s ability to readily meet all of M.J.'s needs and prevent S.J. from being able to safely respond to any emergencies. Wolter had provided S.J. multiple lists of nearby service providers for substance use treatment that were sent by mail as well as e-mail, and he informed S.J. of evening classes that would work around his work schedule. S.J. would have needed to participate in a new assessment. When Wolter asked S.J. to participate in another assessment in March 2021, S.J. "appeared reluctant to . . . do so," and "reiterate[d] that he did not believe the

---

[4] In the Department's petition for termination, it stated that on October 16, 2020 a UA was completed and it was negative for all substances. Its petition for termination also stated that a UA was completed on March 3, 2021, and it was positive only for cannabinoids and THC-Delta-9.

services were necessary at that time, and that there wasn't any . . . concerns regarding his substance use."

3

Several witnesses testified with respect to S.J.'s ability to parent M.J. S.J. testified that at the time of the trial he worked for a construction company, that he works 40 to 60 or more hours a week, and that with commute time included his work hours were approximately 5:00 a.m. to 7:00 or 7:30 p.m. At the time of the trial, his work mainly consisted of demolishing and rebuilding decks. Over the course of his testimony, S.J. was not able to provide a clear account of his work history.

S.J. testified that he did not recall being contacted by therapist Bartholomew, and that he did not recall anyone contacting him about setting up an appointment for family therapy.

S.J. testified that he has difficulties with paperwork:

> I am terrible with the paperwork day-to-day things. I am good at going to work, getting the boy to school. Great. But day-to-day paperwork, making appointments, going somewhere at a certain time, actually making the appointment and getting there, you know? I show up to work. I can be there at five o'clock in the morning in Renton for work, but to make an appointment and actually going there and set it all up, it is just not very good about that. My mom always took care of everything. I was a mama's boy. She pretty much did everything from paying my bills to holding my money until payday, you know, whatever. Just whatever.

S.J. stated that, if M.J. was in his care, he would be willing to ask for assistance with these things, but did not identify anyone who would be able to help him.

S.J. testified that his 14 year old daughter, who is not a party to this case and does not reside with him, has not attended school for two years "because her mom doesn't . . . make her." When asked what he has done about this, S.J. stated, "Again, more paperwork, and I already have enough on my plate. Like, I am going to bring that on my plate right now? It's on the list."

Wolter testified to concern over S.J.'s conduct during visitations. S.J. was not always compliant with COVID-19 masking requirements, and would fall asleep during visits with M.J. During visits, S.J. sometimes discussed off-limits topics, such as the ongoing case, with M.J. S.J. expressed that he did not agree with the visitation rule prohibiting him from talking about the case with M.J. stating, "That's my son. We talk about what I want to talk to him about." Sharon Ackerman, M.J.'s visit supervisor, testified that she began supervising visits between S.J. and M.J. in the summer of 2020, and that she was still supervising visits up until the trial in late December 2021. Of the 48 visit reports in the record, 15 mention S.J. falling asleep, appearing to fall asleep, or closing his eyes. In each of these 15 visit reports, S.J. had first fed M.J., and M.J. was watching a video, playing video games, or, in one instance, napping alongside S.J. S.J. testified, "I take a nap because I work 70 hours a week, and we are watching movies. Who doesn't take a nap watching a movie[? W]hen have I fallen asleep when I am doing something?"

18

At the time of the trial, S.J. testified that he was ready to parent full time, but needed to find a place to live closer to M.J.'s school and "get everything in order."

Social work supervisor Pastor testified that in order for M.J. to be returned to S.J.'s care, S.J. would need to "either engage in the recommendations of his drug and alcohol evaluation, if the assessor believes those recommendations are still current, or complete an updated evaluation," provide clean UAs showing continued sobriety, participate in a domestic violence evaluation and follow any recommendations for services, and participate in the recommended family counseling with M.J. Pastor testified that she did not think these requirements could be met for at least six months, but potentially would take up to a year, depending on treatment recommendations. Pastor also testified that lengthy foster care creates a situation where children do not have stability or permanency, a concern that is heightened for M.J. because he struggles with uncertainty.

Wolter testified that he did not believe S.J. was able to parent M.J. at the time of the trial. This opinion was "based off of the collective amount of time that . . . the dependency action has been open, as well as [S.J.] having completed a few of the programs, mainly the drug and alcohol assessment, and the parenting assessment; however, he did not follow through with any of the . . . follow-up recommendations for treatment of these identified concerns."

19

II

S.J. challenges one finding of fact and two conclusions of law: (1) finding of fact 16, determining that continuation of the parent-child relationship is a significant barrier to M.J. finding a permanent, loving home, (2) conclusion of law 10, determining that continuation of the parent-child relationship clearly diminishes M.J.'s prospects for early integration into a stable and permanent home, and (3) conclusion of law 11, determining that termination of parental rights is in M.J.'s best interests. We accept as true all other findings of fact in the termination order. In re Interest of Mahaney, 146 Wn.2d 878, 895, 51 P.3d 776 (2002).

This court's role in reviewing a trial court's decision to terminate parental rights is limited to assessing whether substantial evidence supports the trial court's findings. In re Parental Rights to D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020). "The trial court's findings will not be disturbed unless there is an absence of clear, cogent, and convincing evidence in the record. We defer to the trial court's weighing of the evidence and witness credibility determinations." Id. We review de novo whether the court's findings of fact support its conclusions of law. In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016).

To terminate parental rights, the Department must first establish the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a). The "clear, cogent and convincing" burden of proof requires that the evidence be substantial enough to allow the court to conclude that the

allegations are highly probable. In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Second, the Department must prove that termination is in the best interests of the child, by a preponderance of the evidence. RCW 13.34.190(1)(b); In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.2d 1104 (2010). The criteria for establishing the best interests of the child are not capable of specification because each case is dependent upon its own facts and circumstances. In re Dependency of K.W., 199 Wn.2d 131, 152, 504 P.3d 207 (2022).

A

S.J. challenges only one of the termination elements: "that continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." Former RCW 13.34.180(1)(f) (2018).[5]

The Department can meet its burden to prove former RCW 13.34.180(1)(f) in two ways. In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013). First, it can prove that prospects for a permanent home exist, but the parent-child

---

[5] Effective June 9, 2022, the legislature amended former RCW 13.34.180(1)(f) adding new language:

> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. In making this determination, the court must consider the efforts taken by the department to support a guardianship and whether a guardianship is available as a permanent option for the child.

LAWS OF 2022, ch. 127, § 2(1)(f).

relationship prevents the child from obtaining that placement. R.H., 176 Wn. App. at 428. Alternately, it can prove that the relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable placement. Id. The Department is not required to demonstrate a specific prospect for permanent placement to prove former RCW 13.34.180(1)(f). K.D.S., 176 Wn.2d at 658. Former RCW 13.44.180(1)(f) " 'is mainly concerned with the continued effect of the legal relationship between parent and child, as an obstacle to adoption.' " In re Dependency of M.-A.F.-S., 4 Wn. App. 2d 425, 450, 421 P.3d 482 (2018) (quoting In re Dependency of A.C., 123 Wn. App. 244, 250, 98, P.3d 89 (2004)).

Here, the Department argues that it proved M.J. has prospects for adoption and that termination of parental rights is therefore necessary to facilitate permanency. S.J. argues that the Department did not show there was an "imminent adoptive home" for M.J. and, therefore, S.J.'s legal relationship with M.J. is not preventing any adoption from occurring. The record supports the Department's position. Pastor testified that the Department had identified two prospects for permanent placement: (1) a home study was ongoing for adoptive placement with a maternal aunt with who had adopted M.J.'s older siblings, and (2) a selection committee had been set up to interview potential permanent families.

This is substantial evidence supporting the superior court's finding of fact 16 that "[t]he continuation of the parent-child relationship is a significant barrier" to M.J. finding a permanent home. This in turn supports conclusion of law 10 that continuation of the parent-child relationship would diminish M.J.'s prospects for integration into a stable and permanent home under former RCW 13.34.180(1)(f).

B

In evaluating M.J.'s best interests, Washington law places priority on children's rights of "basic nurture, physical and mental health, and safety." RCW 13.34.020. The right of a child to basic nurturing "includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter." Id. S.J. argues he "raised his son most of the child's life, and the two continued to share a close relationship." S.J. reasons that termination is not in M.J.'s best interests because the trial court "fail[ed] to account for the fact that family preservation, even when the family is imperfect, is now broadly understood to promote children's long-term well-being in ways that "legal 'permanence' " does not. S.J. supports this reasoning by citing to several studies and article that he does not show were before the trial court. This builds on S.J.'s argument at trial that he was not deficient in the ways the dependency order indicated, that the ordered assessments and treatment were not necessary, and that as a result his parenting ability was not so compromised that termination would serve M.J.'s best interests. While S.J.'s explicit assignments of error are narrow, his argument on

23

appeal rests on the broader contention that the trial court neglected to balance S.J.'s deficits as a parent, which he contends are less severe than the Department portrays, against the harm of parental separation.

On review of the termination record, it is true the Department did not put forth evidence that supported all of the deficiencies claimed in the dependency. For purposes of establishing that termination is in M.J.'s best interests, the Department was not entitled to rely on the res judicata effect of dependency orders and dispositional plans. In re Dependency of K.R., 128 Wn.2d 129, 145, 904 P.2d 1132 (1995). At the same time, however, the termination trial was not a vehicle for S.J. to relitigate the dependency orders, nor are the dependency orders before us on review. Although we conclude the termination record does not always fully support the asserted deficiencies in S.J.'s parenting, we nevertheless conclude that the record provides substantial evidence supporting the trial court's termination order.

S.J. concedes that the court's findings of fact are generally consistent with the record, taking exception to the court's finding of fact 7, in which the court found S.J. had completed a drug and alcohol assessment that determined he was suffering from severe amphetamine use disorder, and that S.J. was "engaged in nearly daily use." This appears to refer to the assessment done in August 2020—which was 17 months before the termination order entered in January 2022—in which S.J. admitted methamphetamine use. The daily methamphetamine use

finding is apparently contradicted in finding of fact 8, where the court found that "it is unclear as to whether [S.J.] continues to use illicit substances." The trial court was entitled to rely on the August 2020 assessment in ultimately ruling that one of S.J.'s parental deficiencies is "admitted ongoing use of methamphetamines." The record before the termination court and before this court nevertheless is silent as to whether such use was "ongoing" in January 2021.

The trial court found that one of S.J.'s parental deficiencies is "mental health issues." However, the record does not contain any evidence of the nature of any mental health issue. There is evidence that S.J. does not always regulate his emotions. Wolter testified that a domestic violence assessment would include "a brief evaluation of [S.J.'s] mental health," but there is no mention of S.J. being assessed or recommended assessment for mental health treatment. While the dependency order contained a finding of fact that S.J. had "untreated mental health problems," the dependency order does not further define these "problems" and, as noted, does not receive res judicata effect. K.R., 128 Wn.2d at 145. The termination record does not contain allegations or evidence of any specific mental health issues S.J. faces and does not disclose how they limit his parenting or pose a risk to M.J. Since no such finding is supported by the record, it does not support a conclusion that termination is in M.J.'s best interest.

The trial court's remaining findings of fact nevertheless provide sufficient evidence supporting its conclusion, by a preponderance of evidence, that

termination of the parent-child relationship is in M.J.'s best interests. The record demonstrates that M.J. has specific needs for stability and permanency and that S.J. has not engaged in the services needed to be able to care for M.J., especially given those heightened needs. There is evidence in the record that S.J. lacks parenting skills in that he is unable to keep track of the paperwork necessary to manage M.J.'s health and educational needs and was not able to provide a stable living environment for M.J. at the time of the termination proceeding. The fact that S.J. delayed and refused to engage with the ordered services caused M.J. to remain in an uncertain state from the date of the shelter care hearing on October 10, 2019 until the termination trial over two years later, which started on December 20, 2021. Evidence presented at the trial did not show any indication that S.J. was willing to engage with services in the future. This was true for family counseling services and services to assess for and treat substance abuse and domestic violence, both of which would be useful in developing S.J.'s skills to meet M.J.'s needs associated with PTSD and ADHD. While S.J. contended he was able to parent M.J., he conceded he would need to find a new place to live to do so. There was no evidence S.J. had taken any steps to establish this provision for M.J.'s needs. Even if S.J. were to begin the recommended assessments and treatments the day after the termination trial, it would have been another 6 to 12 months before M.J. could be returned to his care. The trial court's findings describing these deficiencies were supported by substantial evidence and they were sufficient to

support the trial court's conclusion that termination was in M.J.'s best interests.

Affirmed.

_Birk, J._

WE CONCUR:

_Smith, A.C.J._          _Andrus, C.J._